**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION | MDL No. 2724<br>No.  16-MD-2724-CMR<br>HON. CYNTHIA M. RUFE |
| _____ | |
| IN RE: DESONIDE CASES | |
| _____ | |
| THIS DOCUMENT RELATES TO: | 16-DS-27243 |
| *ALL INDIRECT RESELLER PLAINTIFF (IRP) ACTIONS* | Civil Case No. 17-cv-3815 |
| | **CLASS ACTION**<br>**JURY TRIAL DEMANDED** |

**INDIRECT RESELLER PLAINTIFFS'
AMENDED CLASS ACTION COMPLAINT**

**FILED WITH REDACTIONS – PUBLIC VERSION**

# TABLE OF CONTENTS

I.  NATURE OF THE ACTION ................................................................................. 1

II. ONGOING FEDERAL AND STATE INVESTIGATIONS ................................ 3

III. THE ROLE OF INDEPENDENT PHARMACIES ............................................. 9

IV. JURISDICTION AND VENUE ......................................................................... 9

V.  PARTIES ......................................................................................................... 11

    A.  Plaintiffs ................................................................................................ 11

    B.  Defendants ............................................................................................ 12

    C.  Co-Conspirators .................................................................................... 13

VI. INTERSTATE AND INTRASTATE TRADE AND COMMERCE ............... 13

VII. BACKGROUND OF THE GENERIC DRUG INDUSTRY ............................ 14

    A.  Generic drugs are commodity products that compete on price ............ 14

    B.  Pricing of generic drugs discourages unilateral price increases .......... 18

VIII. THE GENERIC DESONIDE CONSPIRACY .................................................. 20

    A.  The Desonide Markets .......................................................................... 20

    B.  Defendants conspired to increase the price of Desonide ..................... 21

    C.  As part of the conspiracy, Defendants increased their WAC benchmarks in lockstep ................................................................................................ 28

    D.  No shortages or other market changes can justify Defendants' price increases ... 31

    E.  Defendants acknowledge the lack of generic drug competition .......... 32

    F.  Defendants had many opportunities to conspire on Desonide ............. 33

    G.  Defendants' concerted efforts to increase prices for generic Desonide yielded supracompetitive profits .......................................................................... 42

    H.  The Desonide market is susceptible to collusion ................................ 44

        1.  Industry concentration ............................................................... 44

        2.  Barriers to entry ......................................................................... 46

        3.  Demand inelasticity ................................................................... 47

        4.  Lack of substitutes ..................................................................... 48

        5.  Standardized product with high degree of interchangeability ................ 50

        6.  Inter-competitor contacts and communications ......................... 51

IX. THE STATUTES OF LIMITATIONS DO NOT BAR PLAINTIFFS' CLAIMS .......... 56

i

|  |  | A. | The statutes of limitations did not begin to run because Plaintiffs did not and could not discover Defendants' unlawful conspiracy | 56 |
|  |  | B. | Fraudulent concealment tolled the statutes of limitations | 58 |
|  |  |  | 1. Active concealment of the conspiracy | 59 |
|  |  |  | 2. Plaintiffs exercised reasonable diligence | 60 |

| X. | CONTINUING VIOLATIONS | 60 |
| XI. | DEFENDANTS' ANTITRUST VIOLATIONS | 61 |
| XII. | CLASS ACTION ALLEGATIONS | 62 |
| XIII. | CAUSES OF ACTION | 66 |
| XIV. | PRAYER FOR RELIEF | 112 |
| XV. | JURY DEMAND | 115 |

**FILED WITH REDACTIONS – PUBLIC VERSION**

## I.   NATURE OF THE ACTION

1.      This action brings claims on behalf of pharmacies ("Indirect Reseller Plaintiffs," "independent pharmacies," or "Plaintiffs") for injunctive relief and to recoup overcharges that resulted from an unlawful agreement among Defendants to allocate customers, rig bids, and fix, raise and/or stabilize the prices of generic versions of the topical cream 0.05% and topical ointment 0.05% formulations of the prescription drug Desonide (together "Desonide").[1]

2.      Desonide is a topical corticosteroid used for the treatment of a variety of skin conditions, including eczema, dermatitis, and psoriasis.

3.      For many years, competition among the small group of sellers of Desonide kept prices stable, at low levels.  But starting in May 2013, Defendants, who dominate the markets for Desonide, abruptly raised their respective Desonide prices by an average of 500%, and prices remain at supracompetitive levels today.

4.      Defendants' unlawful and anticompetitive conduct in the Desonide market is part of a larger conspiracy or series of conspiracies involving numerous generic pharmaceuticals and pharmaceutical manufacturers.

5.      The price increases imposed by Defendant manufacturers of generic Desonide cannot be explained by supply shortages or any other market feature or shock.  Nor were they the result of unilateral business decisions.  Instead, the significant increases in the prices of Desonide were the result of an illegal agreement among Defendants to fix prices.

---

[1] In addition to the above-referenced formulations, Desonide is also sold in foam, emollient foam, gel, and lotion formulations.  "Desonide" as used in this complaint refers only to the cream and ointment formulations at issue in this action.

**FILED WITH REDACTIONS – PUBLIC VERSION**

6.      As alleged below, Defendants arranged their conspiracy partly through in-person meetings at trade association events, which allowed them to actively conceal their agreements from paper or electronic records.

7.      Extreme and unprecedented price increases in the generic drug industry—like those imposed by manufacturers of Desonide—have prompted close scrutiny of the industry by the U.S. Congress, federal and state enforcement agencies, and private litigants.

8.      An ongoing criminal investigation by the Antitrust Division of the U.S. Department of Justice ("DOJ") has, to date, resulted in price-fixing guilty pleas from two senior executives at Heritage Pharmaceuticals, Inc. relating to the sale of Doxycycline Hyclate and Glyburide.  But DOJ has made clear that its "investigation is ongoing"[2] and the evidence uncovered during the course of its investigation into those drugs also "implicates…a significant number of the Defendants…[and] a significant number of the drugs at issue" in this Multidistrict Litigation.[3]

9.      The Attorney General for the State of Connecticut ("Connecticut AG"), whose office has been pursuing an investigation of antitrust violations in the generic drug industry, confirms that there is "compelling evidence of collusion and anticompetitive conduct across many companies that manufacture and market generic drugs in the United States . . . [and] evidence of widespread participation in illegal conspiracies across the generic drug industry."[4]

10.     Manufacturers of Desonide are implicated in these ongoing investigations; the Defendants named here—Actavis, Perrigo, Sandoz, and Taro—have received a federal grand jury

---

[2] DOJ, Division Update Spring 2017 (Mar. 28, 2017), *available at* https://www.justice.gov/atr/division-operations/division-update-spring-2017/division-secures-individual-and-corporate-guilty-pleas-collusion-industries-where-products.

[3] Intervenor United States' Motion to Stay Discovery at 1-2 (May 1, 2017) (ECF No. 279).

[4] Connecticut AG, Press Release (Dec. 15, 2016) *available at* http://www.ct.gov/ag/cwp/view.asp?Q=588538&A=2341.

**FILED WITH REDACTIONS – PUBLIC VERSION**

subpoena and/or been raided by the Department of Justice as part of the generic drug price-fixing investigations.

11.     Defendants' agreement to sextuple the prices of their products caused Plaintiffs to pay millions of dollars more than they would have paid in competitive markets for Desonide.

12.     Plaintiffs bring this action against Defendants on account of their past and ongoing violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3) and the state laws set forth below.  Plaintiffs bring this action both individually and on behalf of (a) a national injunctive class of all privately held pharmacies in the United States and its territories that indirectly purchased generic Desonide products manufactured by any Defendant, from May 1, 2013 to the present ("Class Period"), and (b) a damages class of all privately held pharmacies in certain states that indirectly purchased generic Desonide products manufactured by any Defendant, from May 1, 2013 to the present.

## II.     ONGOING FEDERAL AND STATE INVESTIGATIONS

13.     Now in its third year, the federal criminal investigation into generic drug price-fixing has begun to bear fruit. On December 12 and 13, 2016, DOJ filed criminal charges against former Heritage executives Jeffrey Glazer (CEO) and Jason Malek (President). The government alleged that they conspired with others "to allocate customers, rig bids, and fix and maintain prices" of Glyburide and Doxycycline Hyclate in violation of the Sherman Act (15 U.S.C. § 1).[5]

14.     On January 9, 2017, Glazer and Malek pleaded guilty to those charges.[6]  Deputy Assistant Attorney General Brent Snyder of the Justice Department's Antitrust Division explained:

---

[5] Information ¶ 6, United States v. Glazer, No. 2:16-cr-00506-RBS (E.D. Pa. Dec. 12, 2016) (ECF No. 1); Information ¶ 6, United States v. Malek, No. 2:16-cr-00508-RBS (E.D. Pa. Dec. 13, 2016) (ECF No. 1).

[6] See Tr. of Plea Hearing, *United States v. Glazer*, No. 2:16-cr-00506-RBS (E.D. Pa. Jan. 9, 2017) (ECF No. 24); *see also* Tr. of Plea Hearing, *United States v. Malek*, No. 2:16-cr-00508-RBS (E.D. Pa. Jan. 9, 2017) (ECF No. 24).

**FILED WITH REDACTIONS – PUBLIC VERSION**

"These charges are an important step in correcting that injustice and in ensuring that generic pharmaceutical companies compete vigorously to provide these essential products at a price set by the market, not by collusion."[7]  As they await sentencing, Glazer and Malek are cooperating with DOJ's continuing investigation.  More criminal charges and guilty pleas are expected to follow.[8]

15.     Although initial public disclosures suggested that the federal and state investigations were focused on one or two drugs, it is now clear that both investigations are much, much broader.  The investigations reportedly cover two dozen drugs and more than a dozen manufacturers.[9]  Press reports indicate that "[t]he Department of Justice (DoJ) believes price-fixing between makers of generic pharmaceuticals is widespread."[10]

16.     According to one report, prosecutors see the investigation of the generic drug industry much like DOJ's antitrust probe of the auto parts industry, which has morphed into DOJ's largest criminal antitrust probe ever.  *See In re Automotive Parts Antitrust Litig*., No. 2:12-md-02311 (E.D. Mich.).  As in that case, prosecutors expect "to move from one drug to another in a similar cascading fashion."[11]

---

[7] DOJ Press Release (Dec. 14, 2016) *available at* https://www.justice.gov/opa/pr/former-top-generic-pharmaceutical-executives-charged-price-fixing-bid-rigging-and-customer.

[8] *See, e.g.,* Eric Kroh, "Generic Drug Price-Fixing Suits Just Tip Of The Iceberg," Law360 (Jan. 6, 2017) ("'Once somebody starts cooperating, it leads to many more indictments.'"), *available at* https://www.law360.com/articles/877707/generic-drug-price-fixing-suits-just-tip-of-the-iceberg.

[9] David McLaughlin & Caroline Chen, "U.S. Charges in Generic-Drug Probe to Be Filed by Year-End," Bloomberg (Nov. 3, 2016) *available at* http://www.bloomberg.com/news/articles/2016-11-03/u-s-charges-in-generic-drug-probe-said-to-be-filed-by-year-end.

[10] PaRR Report, "DoJ Believes Collusion over Generic Drug Prices Widespread" (June 26, 2015) ("PaRR Report"), *available at* http://www.mergermarket.com/pdf/DoJ-Collusion-Generic-Drug-Prices-2015.pdf.

[11] *Id.*

4

FILED WITH REDACTIONS – PUBLIC VERSION

17.     DOJ and a federal grand jury empaneled in the Eastern District of Pennsylvania have focused on at least sixteen generic drug manufacturers as part of the growing investigation, including: Actavis Holdco U.S., Inc. ("Actavis"); Aurobindo Pharma USA, Inc. ("Aurobindo"); Citron Pharma LLC ("Citron"); Dr. Reddy's Laboratories, Inc. ("Dr. Reddy's"); Heritage Pharmaceuticals, Inc. ("Heritage"); Impax Laboratories, Inc. ("Impax"); Lannett Company, Inc. ("Lannett"); Mayne Pharma, Inc. ("Mayne"); Mylan Inc. ("Mylan"); Par Pharmaceuticals, Inc. ("Par"); Perrigo New York, Inc. ("Perrigo"); Sandoz, Inc. ("Sandoz"); Sun Pharmaceutical Industries, Inc. ("Sun"); Taro Pharmaceuticals USA, Inc. ("Taro"); Teva Pharmaceuticals USA, Inc. ("Teva"); and Zydus Pharmaceuticals USA, Inc. ("Zydus").

18.     The fact that these companies and/or their employees received subpoenas from a federal grand jury is significant.  DOJ does not empanel grand juries lightly.  The *Antitrust Division Manual* admonishes that "staff should consider carefully the likelihood that, if a grand jury investigation developed evidence confirming the alleged anticompetitive conduct, the Division would proceed with a criminal prosecution."  Accordingly, before a grand jury investigation proceeds, it requires a series of approvals, first by the relevant field chief, who then sends the request to the Antitrust Criminal Enforcement Division. "The DAAG [Deputy Assistant Attorney General] for Operations, the Criminal DAAG, and the Director of Criminal Enforcement will make a recommendation to the Assistant Attorney General[,]" who must give final approval and authorize all attorneys who will participate in the investigation.[12]

19.     As Mark Rosman, former assistant chief of the National Criminal Enforcement Section of DOJ's Antitrust Division, noted in an article on the "unusual" nature of the criminal

---

[12] DOJ, Antitrust Division Manual (5th ed. 2015) at Chapter III-81 to 83, *available at* http://www.justice.gov/atr/public/divisionmanual/chapter3.pdf.

**FILED WITH REDACTIONS – PUBLIC VERSION**

subpoenas, "A DOJ investigation into the alleged exchange of pricing information in the pharmaceutical industry likely indicates that the agency anticipates uncovering criminal antitrust conduct in the form of price-fixing or customer allocation."[13]

20.     Another significant indication of criminal price-fixing in the generic drug industry is that DOJ has received assistance from a privately-held company that came forward as a leniency applicant: "It is understood that Heritage is cooperating with prosecutors in exchange for amnesty from criminal prosecution under DOJ's leniency program[.]"[14]  As explained on DOJ's website, an applicant for amnesty "must admit its participation in a criminal antitrust violation involving price fixing, bid rigging, capacity restriction, or allocation of markets, customers, or sales or production volumes, before it will receive a conditional leniency letter." The applicant must also establish that "[t]he confession of wrongdoing is truly a corporate act, as opposed to isolated confessions of individual executives or officials."[15]

21.     In addition to the federal criminal investigation, after years of investigation and on the basis of millions of documents as well as witness testimony, the Attorneys General of at least forty-seven States have filed a complaint in this MDL alleging an overarching conspiracy among generic drug manufacturers to fix prices and allocate customers. The States have made clear that they have "uncovered wide-ranging conduct implicating numerous different drugs and

---

[13] Mark Rosman & Seth Silber, "DOJ's Investigation Into Generic Pharma Pricing Is Unusual," Law360 (Nov. 12, 2014), *available at* https://www.wsgr.com/publications/PDFSearch/rosman-1114.pdf.

[14] Richard Vanderford, "Generic Pharma Investigation Still Broad, Prosecutor Says," mLex (Feb. 21, 2017).

[15] DOJ, *Frequently Asked Questions about the Antitrust Division's Leniency Program* (updated Jan. 26, 2017), *available a*t https://www.justice.gov/atr/page/file/926521/download.

**FILED WITH REDACTIONS – PUBLIC VERSION**

competitors" [16] and have stated in open court that complaints involving additional drugs and manufacturers will be filed in 2019.

22.     The State AG Complaint explains that the generic drug industry is structured in a way that facilitates these types of collusive communications. "Generic drug manufacturers operate, through their respective senior leadership and marketing and sales executives, in a manner that fosters and promotes routine and direct interaction among their competitors."  This affords them opportunities to "exploit their interactions at various and frequent industry trade shows, customer conferences and other similar events, to develop relationships and sow the seeds for their illegal agreements." [17]

23.     The indictments and guilty pleas relating to Glazer and Malek, the grand jury subpoenas, and evidence divulged in the State AG Complaint are merely the tip of the iceberg. The government investigations have uncovered the existence of "a broad, well-coordinated and long-running series of schemes to fix the prices and allocate markets for a number of generic pharmaceuticals in the United States." [18]

24.     At least certain of the Defendants are the targets of investigations by federal antitrust regulators concerning the pricing of their generic pharmaceutical products, including Desonide.  In its August 8, 2015 10-Q, Allergan (Actavis's corporate parent) announced that on June 25, 2015, Actavis had "received a subpoena from the U.S. Department of Justice ('DOJ'), Antitrust Division seeking information relating to the marketing and pricing of certain of the Company's generic products and communications with competitors about such products."  On

---

[16] *State of Connecticut v. Aurobindo Pharma USA, Inc.*, No. 3:16-cv-2056 (VLB) (D. Conn.) (Doc. 168 at ¶ 9) (State AG Amended Complaint).

[17] State AG Amended Complaint ¶ 7.

[18] State AG Amended Complaint ¶ 1.

**FILED WITH REDACTIONS – PUBLIC VERSION**

September 8, 2016, Taro's parent company announced that Taro, "as well as two senior officers in its commercial team, received grand jury subpoenas from the United States Department of Justice, Antitrust Division, seeking documents relating to corporate and employee records, generic pharmaceutical products and pricing, communications with competitors and others regarding the sale of generic pharmaceutical products, and certain other related matters."  On May 2, 2017, Perrigo announced that the Antitrust Division had executed search warrants in a raid of its corporate offices as part of the DOJ's ongoing drug pricing investigation.[19] And in March 2016, Sandoz and Fougera Pharmaceuticals Inc. (a wholly owned subsidiary of Sandoz) "received a subpoena from the Antitrust Division of the US Department of Justice (DOJ) requesting documents related to the marketing and pricing of generic pharmaceutical products…and related communications with competitors."[20]

25.     In a February 28, 2017 letter filed in this action prior to its transfer to this Court, the DOJ confirmed that there are "significant overlaps between the companies and drugs that are being investigated criminally and the Defendants and drugs identified in plaintiffs' amended complaints in these civil actions [including the amended Desonide complaint]."[21]

26.     Plaintiffs do not yet have access to all of the information available to the government enforcement agencies.  What is known is that starting in June 2013, after representatives of the Defendants attended meetings of the Generic Pharmaceutical Association, Defendants abruptly and sharply raised their respective Desonide prices to nearly identical levels.

---

[19] http://perrigo.investorroom.com/2017-05-02-Perrigo-Discloses-Investigation.

[20] Novartis 2016 Financial Report at 217, *available at* https://www.novartis.com/sites/www.novartis.com/files/ar-2016-financial-report-en.pdf.

[21] *In re: Clobetasol Antitrust Litig.*, No. 1:16-mc-7229 (S.D.N.Y), ECF No. 58 at 1.

**FILED WITH REDACTIONS – PUBLIC VERSION**

The allegations herein demonstrate that the large and unprecedented price increases for Desonide cannot be explained by normal, competitive market forces.  The explanation is collusion.

### III.    THE ROLE OF INDEPENDENT PHARMACIES

27.    There are approximately 22,000 privately-owned independent pharmacies in the United States, as contrasted with chain drug stores such as CVS, Walgreens, and Rite Aid, and mass merchandiser or supermarket drug stores such as Wal-Mart, Target and Kroger. Over a billion prescriptions for U.S. patients are dispensed through independent pharmacies each year.

28.    Independent pharmacies rarely purchase generic drugs directly from the manufacturer, and instead acquire drugs almost exclusively from drug wholesalers such as McKesson Corp., Cardinal Health Inc., or Amerisource Bergen Corp. As one would expect, the wholesaler's price includes a percentage markup over the manufacturer's price. Independent pharmacies, lacking the sales volume heft and wholesaler relationships enjoyed by their much larger competitors, have no meaningful ability to negotiate these acquisition costs. They must pay the price the wholesaler charges. As a result, when drug manufacturers collude to allocate customers or raise the prices of generic drugs, independent pharmacies end up paying illegally inflated prices for those drugs.

### IV.    JURISDICTION AND VENUE

29.    Plaintiffs bring Count One of this action under Section 16 of the Clayton Act (15 U.S.C. § 26) for injunctive relief and costs of suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiffs and the members of the Classes described herein by reason of the violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

**FILED WITH REDACTIONS – PUBLIC VERSION**

30.     This action is also instituted under the antitrust, consumer protection, and common laws of various states and territories for damages and equitable relief, as described in Counts Two through Four below.

31.     Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1337 and by Section 16 of the Clayton Act (15 U.S.C. § 26). In addition, jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1332(d) and 1367.

32.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) and 22 and 28 U.S.C §§ 1391(b), (c) and (d); and 1407 and MDL Order dated April 6, 2017 (ECF No. 291), and because, during the Class Period, Defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of the affected interstate trade and commerce described below has been carried out in this District. Venue is also proper in this District because the federal grand jury investigating the pricing of generic drugs is empaneled here and therefore it is likely that acts in furtherance of the alleged conspiracy took place here. According to DOJ guidelines, an "investigation should be conducted by a grand jury in a judicial district where venue lies for the offense, such as a district from or to which price-fixed sales were made or where conspiratorial communications occurred."[22]

33.     This Court has personal jurisdiction over each Defendant because, *inter alia*, each Defendant: (a) transacted business throughout the United States, including in this District; (b) sold Desonide throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; (d) was engaged in an illegal scheme and nationwide price-fixing conspiracy that was directed at, had the intended effect of causing injury to, and did cause injury to persons residing in, located in, or doing business throughout the

---

[22] DOJ, Antitrust Division Manual at III-83.

FILED WITH REDACTIONS – PUBLIC VERSION

United States, including in this District; and/or (e) took overt action in furtherance of the conspiracy in this District or conspired with someone who did, and by doing so could reasonably have expected to be sued in this District. In addition, nationwide personal jurisdiction was authorized by Congress pursuant to the Clayton Act and by 28 U.S.C. § 1407.

**V.   PARTIES**

**A.   Plaintiffs**

34.    Plaintiff West Val Pharmacy ("West Val") is a privately held independent pharmacy that has been in business since 1959 and is currently located at 5353 Balboa Boulevard in Encino, California. West Val Pharmacy indirectly purchased and continues to purchase Defendants' generic Desonide products at supracompetitive prices during the Class Period, and was thereby injured and suffered damages as a result of Defendants' unlawful conduct.

35.    Plaintiff Halliday's & Koivisto's Pharmacy ("Halliday's") is an independent pharmacy located at 4133 University Boulevard in Jacksonville, Florida. Halliday's has served the Jacksonville community for over 50 years. Halliday's indirectly purchased and continues to purchase Defendants' generic Desonide products at supracompetitive prices during the Class Period, and was thereby injured and suffered damages as a result of Defendants' unlawful conduct.

36.    Plaintiff Russell's Mr. Discount Drugs, Inc. ("Russell's") was a privately held independent pharmacy located at 334 Depot Street, in Lexington, Mississippi from the time of its opening in February 1986 until it sold the prescription drugs portion of its business to a pharmacy chain on July 14, 2016. Russell's indirectly purchased Defendants' generic Desonide products at supracompetitive prices during the class period, and was thereby injured and suffered damages as a result of Defendants' unlawful conduct.

11

**FILED WITH REDACTIONS – PUBLIC VERSION**

37.     Plaintiff Falconer Pharmacy, Inc. ("Falconer") is a privately held independent pharmacy located in Falconer, New York. Falconer Pharmacy indirectly purchased and continues to purchase Defendants' generic Desonide products at supracompetitive prices during the Class Period, and was thereby injured and suffered damages as a result of Defendants' unlawful conduct.

38.     Plaintiff Chet Johnson Drug, Inc. ("Chet Johnson") is a privately held independent pharmacy in Avery, Wisconsin. Chet Johnson indirectly purchased and continues to purchase Defendants' generic Desonide products at supracompetitive prices during the Class Period, and was thereby injured and suffered damages as a result of Defendants' unlawful conduct.

**B.     Defendants**

39.     Defendant Actavis Holdco U.S., Inc. is a corporation with its principal place of business in Parsippany, New Jersey.  In August 2016, Teva Pharmaceuticals U.S., Inc. acquired Allergan plc's generics business (including Actavis generics).  Actavis manufactures, markets, and sells generic drug products.  During the Class Period, Actavis sold Desonide to customers in this District and other locations in the United States.

40.     Defendant Perrigo New York, Inc., a Delaware corporation with offices at 1700 Bathgate Ave, Bronx, NY 10457, manufactures Perrigo's cream and ointment tubes, producing more than 50 million tubes annually.  During the Class Period, Perrigo sold Desonide to customers in this District and other locations in the United States.

41.     Defendant Sandoz, Inc. ("Sandoz"), is a Colorado corporation with its principal place of business in Princeton, New Jersey.  Sandoz is a global leader in generic pharmaceuticals and biosimilars, and is a subsidiary of Novartis AG.  During the Class Period, Sandoz sold Desonide to customers in this District and other locations in the United States.

**FILED WITH REDACTIONS – PUBLIC VERSION**

42.     Defendant Taro Pharmaceuticals USA, Inc. (Taro) is a New York corporation with its principal place of business in Hawthorne, New York.  Taro is a wholly-owned subsidiary of Taro Pharmaceutical Industries, Ltd.  During the Class Period, Taro sold Desonide to customers in this District and other locations in the United States.

C.     **Co-Conspirators**

43.     Various other persons, firms, corporations and entities have participated as co-conspirators with Defendants in the violations and conspiracy alleged herein, although their identities are presently unknown to Plaintiffs. In order to engage in the violations alleged herein, these co-conspirators have performed acts and made statements in furtherance of the antitrust violations and conspiracies alleged herein.  Plaintiffs may amend this Complaint to allege the names of additional co-conspirators as they are discovered.

VI.     **INTERSTATE AND INTRASTATE TRADE AND COMMERCE**

44.     During the Class Period, Defendants sold and distributed Desonide in a continuous and uninterrupted flow of interstate commerce to customers throughout the United States, including in this District.

45.     Defendants' and their co-conspirators' conduct, including the marketing and sale of Desonide, took place within, has had, and was intended to have, a direct, substantial, and reasonably foreseeable anticompetitive effect upon interstate commerce within the United States.

46.     Defendants' anticompetitive conduct occurred in part in trade and commerce within the states and territories set forth herein, and also had substantial intrastate effects in that, *inter alia*, drug wholesalers within each state and territory were foreclosed from offering less expensive Desonide to Plaintiffs inside each respective state and territory. The foreclosure of these less

13

expensive generic products directly impacted and disrupted commerce for Plaintiffs within each state and territory and forced Plaintiffs to pay supracompetitive prices.

### VII.    BACKGROUND OF THE GENERIC DRUG INDUSTRY

**A.    Generic drugs are commodity products that compete on price**

47.    Approximately 88% of all pharmaceutical prescriptions in the United States are filled with a generic drug.[23] In 2015, generic drug sales in the United States were estimated at $74.5 billion.[24]

48.    According to the U.S. Food & Drug Administration ("FDA"), a generic drug is "the same as a brand name drug in dosage, safety, strength, how it is taken, quality, performance, and intended use."[25] Once the FDA approves a generic drug as "therapeutically equivalent" to a brand drug, the generic version "can be expected to have equal effect and no difference when substituted for the brand name product."[26]

49.    In a competitive market, generic drugs cost substantially less than branded drugs. The U.S. Congressional Budget Office ("CBO") estimates that, "[o]n average, the retail price of a generic drug is 75 percent lower than the retail price of a brand-name drug."[27]  And that may be conservative.  According to a Federal Trade Commission ("FTC") study, in a "mature generic

---

[23] GPhA, *Generic Drug Savings in the U.S.* (2015) ("GPhA Report") at 1, *available at* http://www.gphaonline.org/media/wysiwyg/PDF/GPhA_Savings_Report_2015.pdf.

[24] Connecticut AG, Press Release (Dec. 15, 2016), *available at* http://www.ct.gov/ag/cwp/view.asp?Q=588538&A=2341.

[25] FDA Website, *available at* http://www.fda.gov/Drugs/InformationOnDrugs/ucm079436.htm#G.

[26] *Id.*

[27] CBO, *Effects of Using Generic Drugs on Medicare's Prescription Drug Spending* (Sep. 15, 2010), *available at* https://www.cbo.gov/publication/21800.

14

**FILED WITH REDACTIONS – PUBLIC VERSION**

market, generic prices are, on average, 85% lower than the pre-entry branded drug price."[28] Mature generic markets—like those for Desonide—typically have several manufacturers that compete for sales, hence keeping prices in check.

50.     Generic drug price competition provides enormous savings to consumers, pharmacies, and other drug purchasers, as well as to private health insurers, health and welfare funds, and state Medicaid programs.  Indeed, one study found that the use of generic medicines saved the United States healthcare system $254 billion in 2014 alone, and $1.68 trillion between 2005 and 2014.[29]

51.     The significant cost savings provided by generic drugs motivated Congress to enact the Drug Price Competition and Patent Term Restoration Act of 1984, more commonly known as the "Hatch-Waxman Act" (Pub. L. No. 98-417, 98 Stat. 1585). The Act streamlines the regulatory hurdles that generic drug manufacturers have to clear prior to marketing and selling generic drugs. Generic drug manufacturers may obtain FDA approval in an expedited fashion through the filing of an Abbreviated New Drug Application ("ANDA") that establishes that its product is bioequivalent to the branded counterpart.

52.     Since passage of the Hatch-Waxman Act, every state has adopted substitution laws requiring or permitting pharmacies to substitute generic drug equivalents for branded drug prescriptions (unless the prescribing physician specifically orders otherwise by writing "dispense as written" or similar language on the prescription).

53.     Because each generic is readily substitutable for another generic of the same brand drug, pricing is the main differentiating feature. As recognized by the FTC, "generic drugs are

---

[28] FTC, *Pay-For-Delay: How Drug Company Pay-offs Cost Consumers Billions* (Jan. 2010), *available at* http://www.ftc.gov/os/2010/01/100112payfordelayrpt.pdf.

[29] GPhA Report at 1.

**FILED WITH REDACTIONS – PUBLIC VERSION**

commodity products" and, as a consequence of that, are marketed "primarily on the basis of price."[30]  Taro's parent company has explained in SEC filings that "the pharmaceutical industry in which we operate is intensely competitive. We are particularly subject to the risks of competition. For example, the competition we encounter may have a negative impact upon the prices we may charge for our products, the market share of our products and our revenue and profitability."  In a competitive market, generic manufacturers cannot significantly increase prices (or maintain high prices in the face of a competitor's lower price) without losing a significant volume of sales.

54.    It is well-established that competition among generic manufacturers drives down price.  Before generic drugs enter a market, the brand drug has a monopoly and captures 100% of sales.  When lower-priced generics become available, the brand drug quickly loses market share as purchasers switch to the cheaper alternatives.  Over time, the price of a generic drug approaches the manufacturers' marginal costs.  Taro's parent company has emphasized that "[d]ue to increased competition from other generic pharmaceutical manufacturers as they gain regulatory approvals to market generic products, selling prices and related profit margins tend to decrease as products mature. . . .  These pricing pressures are inherent in the generic pharmaceutical industry."

55.    As illustrated in the following chart, the price of a generic drug tends to decrease as more generic drug manufacturers enter the market:

---

[30] FTC, *Authorized Generic Drugs: Short-Term Effects and Long-Term Impact* (Aug. 2011), *available at* http://www.ftc.gov/os/2011/08/2011genericdrugreport.pdf.

**FILED WITH REDACTIONS – PUBLIC VERSION**



Source:  FDA analysis of retail sales data from IMS Health, IMS National Sales
Perspective (TM), 1999-2004, extracted February 2005

56.     When new entrants join a competitive generic market, they typically will price their product below the prevailing market price in order to gain market share.  A recent government report confirmed this phenomenon in interviews with generic manufacturers: "manufacturers said that if a company is bringing a generic drug into an established drug market, it typically offers a price that is lower than the current market price in order to build its customer base. Manufacturers also said that as each new manufacturer enters an established generic drug market the price of that generic will fall, with one manufacturer noting that it is typically a 20 percent price decline per entrant."[31]

57.     When there are multiple generic manufacturers in an established generic market—as with Desonide—prices should remain low and stable, and should not increase absent a market disruption or, as is the case here, anticompetitive conduct.

---

[31] GAO Report at 23.

**FILED WITH REDACTIONS – PUBLIC VERSION**

**B.     Pricing of generic drugs discourages unilateral price increases**

58.     In simple terms, the generic pharmaceutical supply chain flows as follows: Manufacturers sell drugs to wholesalers. Wholesalers sell drugs to pharmacies. Pharmacies dispense the drugs to consumers, who pay the full retail price if they are uninsured, or a portion of the retail price (e.g., a co-pay or co-insurance) if they are insured.  The insured consumers' health plans then pay the pharmacies additional amounts that are specified in agreements between them and the pharmacies.  These agreements are sometimes arranged by middlemen known as Pharmacy Benefit Managers ("PBMs").

59.     Because the prices paid by purchasers of generic drugs differ at each level of the market and most of the transactions occur between private parties according to terms that are not publicly disclosed, the price of a given drug is not always obvious.  Marketwide pricing for a given drug, however, may be observed through the Centers for Medicare & Medicaid Services ("CMS") survey of National Average Drug Acquisition Cost ("NADAC").  NADAC was "designed to create a national benchmark that is reflective of the prices paid by retail community pharmacies to acquire prescription . . . drugs."[32]  "NADAC is a simple average of the drug acquisition costs submitted by retail pharmacies," in effect "a single national average."[33]  Thus, NADAC is one way to track general price trends in the marketplace.

60.     While NADAC provides the average price level across all manufacturers of a given drug, other price measures are manufacturer-specific. Drug manufacturers typically report benchmarks—like Wholesale Acquisition Cost ("WAC")—for their drugs, which are then

---

[32] CMS, Methodology for Calculating the National Average Drug Acquisition Cost (NADAC) for Medicaid Covered Outpatient Drugs at 5, *available at* https://www.medicaid.gov/medicaid-chip-program-information/by-topics/prescription-drugs/ful-nadac-downloads/nadacmethodology.pdf.

[33] *Id.*

**FILED WITH REDACTIONS – PUBLIC VERSION**

published in compendia used by participants in the pharmaceutical industry.  The benchmarks are not actual transaction prices; rather, they are the manufacturer's reported list price, which is sometimes subject to discounts.  In order track manufacturer-specific pricing, this complaint uses QuintilesIMS's National Sales Perspectives ("NSP") data, which "captures 100% of the total U.S. pharmaceutical market, measuring sales at actual transaction prices rather than using an average wholesale price" and includes sales by manufacturers into various outlets.[34]

61.     When third-party payers (e.g., health plans) pay pharmacies to dispense drugs to their covered patients, the amount is typically determined with reference to a benchmark or list price like a WAC.  Some third-party payers and PBMs have implemented their own individual caps—Maximum Allowable Cost ("MAC")—that set the maximum amounts they will pay pharmacies for some generic drugs, regardless of the pharmacies' acquisition costs. A pharmacy must often dispense the drug at a loss if it cannot find a wholesaler offering the drug at a price or below the MAC cap.

62.     Although MAC caps do not apply directly to manufacturers, these caps impose a restraint on manufacturers' prices. The MAC cap essentially limits the pharmacies' discretion to adjust retail prices upwards, so pharmacies are incentivized to buy from the cheapest wholesaler and wholesalers to buy from the cheapest manufacturer. This additional pressure on prices means a generic manufacturer that increases its price for a drug should expect to lose sales to a competitor with a lower price.  Consequently, in the absence of coordinated pricing activity among generic manufacturers, an individual manufacturer should not be able to significantly increase its price (or maintain a higher price in the face of a significantly lower competitor price) without incurring the

---

[34]  IMS Institute for Healthcare Informatics, HSRN Data Brief: National Sales Perspectives at 1, *available at* https://www.imshealth.com/files/web/IMSH%20Institute/NSP_Data_Brief-.pdf.

**FILED WITH REDACTIONS – PUBLIC VERSION**

loss of a significant volume of sales.  In a market with MAC caps, it is unlikely that a generic drug manufacturer would risk raising its price unless it has been agreed with competitors that they will raise their prices, too.

## VIII.   THE GENERIC DESONIDE CONSPIRACY

### A.   The Desonide Markets

63.   Desonide is a widely prescribed topical corticosteroid used for the treatment of a variety of skin conditions.  It is sold throughout the United States and its territories.

64.   The markets for Desonide are mature, and Defendants that operate in those markets can only gain market share by competing on price.

65.   The Desonide products at issue in this case are the generic versions of the brand name drug Desowen.  The FDA approved Perrigo's New Drug Application (NDA) for the cream formulation in 1972 and the ointment formulation in 1974.  While Perrigo's Desonide products were approved pursuant to a NDA, they are nonetheless marketed as generic, and not branded, products.

66.   Additional versions of Desonide have been available for purchase in the United States since the late 1980s.[35]  But when Defendants implemented their price increases in July 2013, the markets were dominated by Defendants.  Perrigo and Taro collectively controlled 100% Desonide cream market immediately prior to the price increases, and Actavis joined the cream market once the price increases began.  Perrigo and Taro collectively controlled over 99% of the ointment market at the time of their price increases, with Sandoz beginning to actively market its generic product (for which it had received FDA approval in 2001) in the summer of 2014.

---

[35] See, e.g., Drugs@FDA Database, https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm, ANDA 074249 (cream); ANDA 075325 (emollient cream); ANDA 074221 (ointment); ANDA 075279 (gel); ANDA 074222 (solution).

FILED WITH REDACTIONS – PUBLIC VERSION

67.     According to data from QuintilesIMS ("IMS"),[36] total sales of Desonide (ointment and cream) were approximately ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.

68.     At all relevant times, Defendants had substantial market power with respect to Desonide.  Defendants exercised this power to maintain supracompetitive prices for Desonide without losing so many sales as to make the elevated price unprofitable.

69.     Defendants sold Desonide at prices in excess of marginal costs, in excess of a competitive price, and enjoyed high profit margins.

70.     Through their market dominance, Defendants have successfully foreclosed the market to rival competition, thereby maintaining and enhancing market power and enabling Defendants to charge Plaintiffs supracompetitive prices for Desonide.

**B.      Defendants conspired to increase the price of Desonide**

71.     Competition in the Desonide markets had caused prices to stabilize and remain relatively low from at least January 2011 until Defendants raised prices in June 2013.  Defendants' June 2013 price increases represented a departure from the stable pricing of prior years and from ordinary pricing practices, and are indicative of collusion.

---

[36] QuintilesIMS, formerly known as IMS Health, provides data to and about the pharmaceutical industry

72.     Data from the National Average Drug Acquisition Cost ("NADAC")[37] for Desonide show the low and stable prices of Desonide characteristic of the markets prior to the Defendants' price hikes, and the huge spike in price that occurred abruptly in June 2013.  Since that time, Defendants have continued to charge supracompetitive prices.



---

[37] NADAC is a measure of the cost of drugs developed by the National Association of State Medicaid Directors to set a single national pricing benchmark based on average drug acquisition costs.  NADAC price data is precise and accurate, according to the Centers for Medicare and Medicaid Services.

FILED WITH REDACTIONS – PUBLIC VERSION



73.     As the graphs illustrate, prior to Defendants' price increases, the prices of Desonide remained flat and at competitive levels.  Then, starting in June of 2013, the average price of Desonide increased by approximately 636%, with certain formulations increasing as much as 874% over the same time period.

74.     The market-wide Desonide price increases are the result of Taro and Perrigo increasing their respective Desonide prices at substantially the same time to substantially the same levels in the summer of 2013.  Actavis joined the conspiracy and in September 2013 entered the Desonide cream market and began selling its product at the same elevated price as Taro and Perrigo.  Sandoz also joined the conspiracy and in February 2014 became active in the Desonide ointment market, selling its product at the same elevated price as Taro and Perrigo.

FILED WITH REDACTIONS – PUBLIC VERSION

75.     On average, Perrigo and Taro increased their NSP prices (effective prices) of

Desonide cream by ███████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████ .

76.     The following graphs illustrate the NSP prices of the various Desonide

formulations.



**FILED WITH REDACTIONS – PUBLIC VERSION**



77.  **Taro**: For over two years before the Class Period began, the average effective price

per unit of Taro's products was: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

78.  In April 2013, its effective prices were only somewhat higher.  But in May 2013, it

began a drastic increase of its effective prices:

| Product | Price April 2013 | Hike Date | Hike Price | Percentage Increase |
|---|---|---|---|---|
| CREAM 15 g | ▮ | ▮ | ▮ | ▮ |
| CREAM 60 g | ▮ | ▮ | ▮ | ▮ |
| OINTMENT 15 g | ▮ | ▮ | ▮ | ▮ |
| OINTMENT 60 g | ▮ | ▮ | ▮ | ▮ |

**FILED WITH REDACTIONS – PUBLIC VERSION**

79.     Taro's effective prices would continue to climb, peaking a few months later, increasing as much as ▮▮▮ above its pre-conspiracy price levels:

| Product | Price Date | Peak Price | Percentage Increase |
|---------|-----------|-----------|---------------------|
| CREAM 15 g | ▮ | ▮ | ▮ |
| CREAM 60 g | ▮ | ▮ | ▮ |
| OINTMENT 15 g | ▮ | ▮ | ▮ |
| OINTMENT 60 g | ▮ | ▮ | ▮ |

80.     Even today, Taro's effective prices remain unexpectedly high and would not have remained so high but for the price fixing conspiracy.  For example, in November 2016, its prices were as much as ▮▮ higher than in April 2013:

| Product | Price April 2013 | Price Nov. 2016 | Percentage Increase |
|---------|-----------------|-----------------|---------------------|
| CREAM 15 g | ▮ | ▮ | ▮ |
| CREAM 60 g | ▮ | ▮ | ▮ |
| OINTMENT 15 g | ▮ | ▮ | ▮ |
| OINTMENT 60 g | ▮ | ▮ | ▮ |

81.     **Perrigo**: For over two years before the Class Period began, the average effective price per unit of its products was: ▮▮▮▮▮▮▮▮▮▮ for its 15 gm cream, 60 gm cream, 15 gm ointment, and 60 gm ointment respectively.

82.     In April 2013, its effective prices were only somewhat higher.  But in May and June of 2013, it began a drastic increase of its effective prices:[38]

_____

[38] Effective prices are calculated to 12 decimals; for ease of reference, prices in this complaint are rounded to the nearest cent.  However, percentage increases are calculated based on the more precise calculated price (*i.e.*, the number defined by as many as 12 decimals).

FILED WITH REDACTIONS – PUBLIC VERSION

| Product | Price April 2013 | Hike Date | Hike Price | Percentage Increase |
|---|---|---|---|---|
| CREAM 15 g | ■ | ■ | ■ | ■ |
| CREAM 60 g | ■ | ■ | ■ | ■ |
| OINTMENT 15 g | ■ | ■ | ■ | ■ |
| OINTMENT 60 g | ■ | ■ | ■ | ■ |

83.     Perrigo's effective prices would continue to climb, peaking a few months later, increasing as much as ■ above its pre-conspiracy price levels:

| Product | Price Date | Peak Price | Percentage Increase |
|---|---|---|---|
| CREAM 15 g | ■ | ■ | ■ |
| CREAM 60 g | ■ | ■ | ■ |
| OINTMENT 15 g | ■ | ■ | ■ |
| OINTMENT 60 g | ■ | ■ | ■ |

84.     Even today, Perrigo's effective prices remain unexpectedly high and would not have remained so high but for the price fixing conspiracy.  For example, in November 2016, its prices were as much as ■ higher than in April 2013:

| Product | Price April 2013 | Price Nov. 2016 | Percentage Increase |
|---|---|---|---|
| CREAM 15 g | ■ | ■ | ■ |
| CREAM 60 g | ■ | ■ | ■ |
| OINTMENT 15 g | ■ | ■ | ■ |
| OINTMENT 60 g | ■ | ■ | ■ |

85.     **Sandoz**: Sandoz largely withdrew from the ointments market until about February 2014.  Very soon after its return, Sandoz drastically increased its prices at supracompetitive levels

27

comparable to the other Defendants.   Likewise, even today Sandoz's prices are far above Defendants' pre-conspiracy prices.

86.   **Actavis**:   Actavis did not enter the Desonide market until the Class period had already begun.   Instead of competing on price, Actavis's effective prices generally peaked within a month after entering the market at supracompetitive prices comparable to the other Defendants. Likewise, even today Actavis's prices are far above Defendants' pre-conspiracy prices.

> **C.   As part of the conspiracy, Defendants increased their WAC benchmarks in lockstep**

87.   The following graphs show the Defendants' wholesale acquisition cost ("WAC") prices, which act as list prices in the pharmaceutical industry.[39]   These graphs, which use data from IMS, depict the Defendants' collusive behavior: each raised their WAC prices to essentially the same level.

---

[39] WAC prices are manufacturers' reported list prices for sale to wholesalers.   As list prices, they do not reflect discounts or rebates.

**FILED WITH REDACTIONS – PUBLIC VERSION**





29

**FILED WITH REDACTIONS – PUBLIC VERSION**

88.    The following tables show the precise dates for each WAC increase.

| Product | Defendant | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---------|-----------|---------|---------|------------------|---------------------|
| CREAM 15 g | ███ | ███ | ███ | ██████ | ███ |
| CREAM 15 g | ███ | ███ | ███ | ██████ | ███ |
| CREAM 15 g | ████ | █ | ███ | █████ | █ |

| Product | Defendant | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---------|-----------|---------|---------|------------------|---------------------|
| CREAM 60 g | ██ | ███ | ███ | ██████ | ███ |
| CREAM 60 g | ███ | ███ | ███ | ██████ | ███ |
| CREAM 60 g | ████ | █ | ███ | █████ | █ |

| Product | Defendant | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---------|-----------|---------|---------|------------------|---------------------|
| OINTMENT 15 g | ███ | ███ | ███ | ██████ | ███ |
| OINTMENT 15 g | | | | | |
| OINTMENT 15 g | ███ | █ | ███ | █████ | █ |

| Product | Defendant | Old WAC | New WAC | Date of Increase | Percentage Increase |
|---------|-----------|---------|---------|------------------|---------------------|
| OINTMENT 60 g | ███ | ███ | ███ | ██████ | ███ |
| OINTMENT 60 g | | | | | |
| OINTMENT 60 g | ███ | █ | ███ | █████ | █ |

89.    The overcharges resulting from Defendants' conduct are directly traceable through the pharmaceutical distribution chain to independent pharmacies.  A manufacturer first sells the drug to direct purchaser wholesalers based on the listed WAC, minus applicable discounts. Wholesalers then sell the drug to pharmacies at a price based on the WAC. Independent pharmacies in particular cannot meaningfully negotiate their acquisition costs or their retail prices for insured

30

patients (because these are subject to network agreements). Independent pharmacists may dispense drugs at a loss when they know certain uninsured patients will have trouble affording necessary drugs, but when the price increases are severe, the pharmacy's charity can reach only so far.

**D.    No shortages or other market changes can justify Defendants' price increases**

90.    No apparent, reasonable competitive justifications explain these abrupt shifts in pricing conduct.  To the contrary, anticompetitive activity explains these skyrocketing Desonide prices.  As Richard Evans at Sector & Sovereign Research recently wrote: "[a] plausible explanation [for price increases of generic drugs] is that generic manufacturers, having fallen to near historic low levels of financial performance, are cooperating to raise the prices of products whose characteristics – low sales due to either very low prices or very low volumes –accommodate price inflation."[40]

91.    The price increases cannot be attributed to the need to fund research and development.  Generic pharmaceutical firms do not incur the large research and development costs that brand firms absorb in developing new drugs.  Moreover, the costs associated with developing and obtaining FDA approval for Desonide were incurred over 30 years ago when the drug was first introduced to the market.

92.    Changes in ingredient costs also do not explain Defendants price increase.  The gel and lotion formulations of Desonide (which are not at issue in this case) did not experience the same coordinated and extraordinary price increases in June 2013 that the cream and ointment formulations experienced, even though all the formulations have the same active ingredient. Between January 1, 2012 and January 1, 2015, the average WAC price of Desonide gel gradually

---

[40] See http://blogs.wsj.com/pharmalot/2015/04/22/generic-drug-prices-keep-rising-but-is-aslowdown-coming.

FILED WITH REDACTIONS – PUBLIC VERSION

increased ███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████.

93.     Defendants' enormous price increases were not due to supply disruptions.  With regard to drug shortages, federal law requires drug manufacturers to report potential shortages to the FDA, the reasons therefor, and the expected duration of the shortage,[41] but no supply disruption was reported by the relevant Defendants with respect to Desonide in the summer of 2013. Desonide does not appear in the American Society of Health-System Pharmacists databases of current and resolved drug shortages.  There were also no significant decreases in Defendants' overall sales volume that might indicate a shortage in the availability of Desonide's active ingredient.

94.     Defendants' Desonide price increases are also not explained by the entry or exit of competitors from the marketplace.  No significant sellers entered or left the Desonide markets between January 2011 and June 2013, and between the end of 2012 and June 2013 there was no significant shift in Defendants' relative market shares.  Prior to the price increases the same group of manufacturers—the Defendants in this case—had been selling Desonide at the same relatively low prices for at least three years.

**E.     Defendants acknowledge the lack of generic drug competition**

95.     Generic pharmaceutical executives frequently spoke publicly about pricing and competition in the market.  Members of the industry publicly acknowledged that they saw competition as causing a problem that generally plagued the generic drug industry—namely, low prices—and praised drug markets involving other companies that did not compete on price.

---

[41] *See* http://www.fda.gov/Drugs/DrugSafety/DrugShortages/ucm050796.htm#q.

**FILED WITH REDACTIONS – PUBLIC VERSION**

96.     On Taro's second quarter 2014 earnings call on November 10, 2014, Taro's CEO stated that sales volumes would not decline due to increasing prices in markets for generic drugs— "I don't think there will be any significant -- we have seen any significant impact of volume shifting because of price adjustments."[42]

F.     **Defendants had many opportunities to conspire on Desonide**

97.     In order to be successful, collusive agreements require a level of trust among the conspirators. While this can be accomplished by one-on-one communications, collaboration is also fostered through industry associations, which facilitate relationships between individuals who should otherwise be predisposed to compete vigorously with each other.

98.     Defendants' agreement was furthered through their participation in trade association meetings and events, including GPhA's Annual Meeting, held February 10-22, 2013 in Orlando, Florida and GPhA's CMC Workshop, held June 4-5, 2013 in North Bethesda, Maryland.  These events took place very close in time to when Defendants executed their price increases.

99.     To sustain a conspiracy, the conspirators must periodically communicate to ensure that all are adhering to the collective scheme. Here, these communications occurred primarily through (1) trade association meetings and conferences, and (2) private meetings, dinners and outings among smaller groups of generic drug manufacturers. Defendants also made public announcements about their satisfaction with one another's pricing behavior.

---

[42] https://seekingalpha.com/article/2665835-taro-pharmaceutical-industries-taro-ceo-kal-sundaram-on-q2-2014-results-earnings-call-transcript?part=single.

**FILED WITH REDACTIONS – PUBLIC VERSION**

100.    The purpose of these secret, conspiratorial meetings, discussions, and communications was to ensure that all Defendants agreed to participate in, implement, and maintain an unlawful bid-rigging, price-fixing, and market and customer allocation scheme.

101.    The industry intelligence-gathering reporting firm *Policy and Regulatory Report* has reportedly obtained information regarding the investigation of generic drug companies by the DOJ, and has indicated that the DOJ is investigating the extent to which trade organizations have been used as forums for collusion between sales personnel among competing generic drug companies.[43]

102.    Defendants were members of numerous trade associations, which they used to facilitate their conspiratorial communications and implement their anticompetitive scheme to raise, maintain, and stabilize the prices of Desonide, and how to allocate markets and customers for Desonide, including, but not limited to, GPhA, the NACDS, ███████.

103.    The GPhA is the "leading trade association for generic drug manufacturers."[44] GPhA was formed in 2000 from the merger of three industry trade associations: the Generic Pharmaceutical Industry Association, the National Association of Pharmaceutical Manufacturers, and the National Pharmaceutical Alliance.

104.    GPhA's website touts, "[b]y becoming part of GPhA, you can participate in shaping the policies that govern the generic industry" and lists its "valuable membership services, such as

---

[43] Eric Palmer, *Actavis gets subpoena as DOJ probe of generic pricing moves up food chain*, Fierce Pharma (Aug. 7, 2015), *available at* http://www.fiercepharma.com/story/actavis-gets-subpoena-doj-probe-generic-pricing-moves-food-chain/2015-08-07.

[44] Ass'n for Accessible Medicines, *The Association*, *available at* http://www.gphaonline.org/about/the-gpha-association.  While MDL 2724 has been pending, the GPhA changed its name to the Association for Accessible Medicines.  *See* Russell Redman, *New name for Generic Pharmaceutical Association*, Chain Drug Review (Feb. 14, 2017), *available at* http://www.chaindrugreview.com/new-name-for-generic-pharmaceutical-association/.

FILED WITH REDACTIONS – PUBLIC VERSION

business networking opportunities, educational forums, access to lawmakers and regulators, and peer-to-peer connections."[45]  GPhA's "member companies supply approximately 90 percent of the generic prescription drugs dispensed in the U.S. each year."

105.    Defendants are current or recent regular members of the GPhA. Regular Members "are corporations, partnerships or other legal entities whose primary United States business derives the majority of its revenues from sales of (1) finished dose drugs approved via ANDAs; (2) products sold as authorized generic drugs; (3) biosimilar/biogeneric products; or (4) DESI products."[46]

106.    Several of Defendants' high-ranking corporate officers have served on GPhA's Board of Directors before and during the Class Period.  Doug Boothe, then-President and CEO of Actavis, was on the Board in 2012. Then from 2013-2015, Doug Boothe served on the Board, but as Executive Vice President and General Manager of Perrigo.  Charlie Mayr, Global Chief Communications Officer of Actavis, Inc. served on the Board in 2013. And Jim Kedrowski of Sun Pharmaceutical (Taro's parent company) and Perrigo's Richard Stec joined the GPhA Board in 2016.  Former Heritage CEO, Jeffrey Glazer, who pleaded guilty to federal criminal charges relating to the price fixing and other anticompetitive activity concerning generic pharmaceuticals, also served on GPhA's Board of Directors.

107.    Defendants (or their affiliates) attended the GPhA meetings shortly before and during the Class Period.  These meetings provided Defendants opportunities to collude.

---

[45] Ass'n for Accessible Medicines, *Membership*, *available at* http://www.gphaonline.org/about/membership.
[46] *Id*.

**FILED WITH REDACTIONS – PUBLIC VERSION**

| Event | Attendees |
|---|---|
| 2012 GPhA Fall Technical Conference<br><br>October 1-3, 2012<br>Bethesda, Maryland | • Actavis<br>• Perrigo Company<br>• Taro Pharmaceuticals, Inc. |
| 2013 GPhA Annual Meeting<br><br>February 20-22, 2013<br>Orlando, Florida | • Actavis, Inc.<br>• Actavis Pharma<br>• Perrigo<br>• Sandoz, Inc.<br>• Sandoz International GmbH<br>• Taro Pharmaceuticals |
| 2013 GPhA CMC Workshop<br><br>June 4-5, 2013<br>Bethesda, Maryland | • Actavis, Inc.<br>• Actavis Pharma<br>• Perrigo Company<br>• Sandoz, Inc.<br>• Sandoz International GmbH<br>• Taro Pharmaceuticals Industries Ltd.<br>• Taro Pharmaceuticals U.S.A., Inc. |
| 2013 GPhA Fall Technical Conference<br><br>October 28-30, 2013<br>Bethesda, Maryland | • Actavis, Inc.<br>• Actavis Elizabeth LLC<br>• Actavis Mid Atlantic LLC<br>• Perrigo Company<br>• Perrigo Israel<br>• Sandoz Canada Inc.<br>• Sandoz GmbH<br>• Sandoz, Inc.<br>• Taro Pharmaceuticals Industries Ltd.<br>• Taro Pharmaceuticals U.S.A., Inc. |
| 2014 GPhA Annual Meeting<br><br>February 19-21, 2014<br>Orlando, Florida | • Actavis, Inc.<br>• Perrigo Company<br>• Perrigo PLC<br>• Sandoz Inc.<br>• Sandoz International GmbH<br>• Taro Pharmaceuticals USA, Inc. |
| 2014 GPhA CMC Workshop<br><br>North Bethesda, Maryland<br>June 3-4, 2014 | • Actavis<br>• Actavis Elizabeth LLC<br>• Actavis Laboratories FL, Inc.<br>• Perrigo Company<br>• Sandoz Inc.<br>• Sandoz International GmbH<br>• Taro Pharmaceuticals Industries Ltd.<br>• Taro Pharmaceuticals USA, Inc. |

FILED WITH REDACTIONS – PUBLIC VERSION

| Event | Attendees |
|---|---|
| 2014 GPhA Fall Technical Conference<br><br>October 27-29, 2014<br>North Bethesda, Maryland | • Actavis<br>• Actavis Elizabeth LLC<br>• Actavis Laboratories FL, Inc.<br>• Actavis, Inc.<br>• Actavis plc<br>• Perrigo Company<br>• Perrigo Israel Pharmaceutical LTD<br>• Perrigo Minnesota<br>• Sandoz GmbH<br>• Sandoz, Inc.<br>• Taro Pharmaceuticals Industries Ltd.<br>• Taro Pharmaceuticals, Inc.<br>• Taro Pharmaceuticals USA |
| 2015 GPhA Annual Meeting<br><br>February 9-11, 2015<br>Miami Beach, Florida | • Actavis<br>• Perrigo Company<br>• Perrigo Company plc<br>• Sandoz, Inc.<br>• Taro Pharmaceuticals USA, Inc. |
| 2015 GPhA CMC Workshop<br><br>June 9 - 10, 2015<br>North Bethesda, Maryland | • Actavis Inc.<br>• Perrigo Company<br>• Sandoz, Inc.<br>• Sandoz International GmbH<br>• Taro Pharmaceuticals Industries Ltd.<br>• Taro Pharmaceuticals Inc.<br>• Taro Pharmaceuticals USA, Inc. |
| 2015 GPhA Fall Technical Conference<br><br>November 2 - 4, 2015<br>North Bethesda, Maryland | • Actavis Inc.<br>• Perrigo Company plc<br>• Perrigo Israel Pharmaceuticals Ltd<br>• Perrigo Minnesota<br>• Sandoz Inc.<br>• Taro Pharmaceuticals Industries Ltd.<br>• Taro Pharmaceuticals USA, Inc. |

108.    Defendants are also members of the National Association of Chain Drug Stores ("NACDS"). The NACDS is a national trade association representing chain pharmacies. Membership is open to generic pharmaceutical manufacturers and members may participate in

NACDS committees and workgroups, and attend various conferences.  Perrigo, Sandoz, and Taro were members from 2013 through 2016.

109.     On April 20-23, 2013, the NACDS held its Annual Meeting in Palm Beach, Florida. NACDS describes the Annual Meeting as "the industry's most prestigious gathering of its most influential leaders," and a "classic 'Top-to-Top' business conference" for the pharmaceutical retailing and manufacturing industries. Attendees are provided a list of participating companies in advance, have access to private meeting rooms where executives can meet in person, and can attend a variety of business programs, invitation-only events, and social functions.

110.     The following of Defendants' representatives, among others, attended NACDS's 2013 Annual Meeting:

> (a)     **Actavis**: Paul Bisaro, Board Member; Andrew Boyer, President and CEO, North America Generics; Sigurdur Olafsson, President and CEO, Global Generics Medicines; Robert Stewart, Chief Operating Officer; Michael Baker, EVP of Trade Sales and Development; Paul Reed, Sr. Director of Trade Sales and Development;

> (b)     **Perrigo**: Joseph Papa, Chairman and CEO; Doug Boothe, President of Generics Division; John Wesolowski, Acting General Manager; Jim Tomshack, Sr. VP of Sales; Philip Willis, Innovation and Marketing Strategy;

> (c)     **Sandoz**: Samuele Butera, Vice President & Head, Biopharmaceuticals, N.A.; Donald DeGolyer, Chief Executive Officer & Board Director; Jeff George, Global Head of Sandoz, Novartis Executive Committee Member; Richard Tremonte, SVP, Global Generic Pharmaceuticals;

> (d)     **Taro**: Ara Aprahamian, VP of Sales and Marketing; Jim Kedrowski, Interim CEO; Michael Perfetto, Chief Commercial Officer for Generic RX/OTC, US and Canada.

**FILED WITH REDACTIONS – PUBLIC VERSION**

111.    Executives, senior management, and salespeople from Defendants Actavis, Perrigo, Sandoz, and Taro attended the NACDS 2014 Annual Meeting held at the Phoenician resort in Scottsdale, Arizona:

(a)    **Actavis**: Paul Bisaro, Board Member; Andrew Boyer, President and CEO, North America Generics; Sigurdur Olafsson, President and CEO, Global Generics Medicines; Robert Stewart, Chief Operating Officer; Paul Reed, Sr. Director of Trade Sales and Development;

(b)    **Perrigo**: Doug Boothe, President of Generics Division; John Wesolowski, Acting General Manager; Tony Polman, National Account Executive;

(c)    **Sandoz**: Peter Goldschmidt, President of Sandoz US and Head, North America; Steven Greenstein, Director for Key Customers; Anuj Hasija, Executive Director for Key Customers; Armondo Kellum, VP of Sales and Marketing; Kirko Kirkov, Executive Director, Key Customers; Scott Smith, VP Sales and Marketing;

(d)    **Taro**: Ara Aprahamian, VP of Sales and Marketing; Michael Perfetto, Chief Commercial Officer for Generic RX/OTC, US and Canada; and from Taro's affiliate, Sun: Steven Goodman, Director of Generics Marketing; Steven Smith, Sr. Director of Sales.

112.    Executives, senior management, and salespeople from Actavis, Perrigo, Sandoz, and Taro attended the NACDS Annual Meeting for 2015 and 2016; both events took place at The Breakers resort in Palm Beach, Florida.

113.    In addition to its Annual Meeting, the NACDS hosts its annual "Total Store Expo," which according to the NACDS website, is "the industry's largest gathering of its most influential leaders. It is a combination of both strategic and tactical business meetings between existing and new trading partners and is attended by industry decision makers."

114.    On August 10-13, 2013, the NACDS held its Total Store Expo at the Sands Expo Convention Center in Las Vegas, Nevada. The following representatives of Defendants, among others, attended:

**FILED WITH REDACTIONS – PUBLIC VERSION**

(a) **Actavis**: Andrew Boyer, President and CEO, North America Generics; Anthony Giannone, Executive Director, Sales; Marc Falkin, Senior Vice President, Sales; Michael Baker, EVP of Trade Sales and Development, Richard Rogerson, Sr. Director of new Products, Business Analytics, and Systems;

(b) **Perrigo**: H. James Booydegraaff, Associate Director of Marketing; Andrea Felix, National Account Executive; Kara Goodnature, Marketing Manager; Ori Gutwerg, National Account Executive; Katie McCormack, National Account Manager; Richard McWilliams, Sr. VP and General Manager; Tony Polman, National Account Executive;

(c) **Sandoz**: Peter Goldschmidt, President of Sandoz US and Head, North America; Christopher Bihari, Director, Key Customers; Steven Greenstein, Director, Key Customers; Armando Kellum, VP of Sales and Marketing; Paul Krauthauser, Sr. VP of Sales and Marketing; Della Lubke, National Account Executive;

(d) **Taro**: Ara Aprahamian, VP of Sales and Marketing; Sheila Curran, VP of Sales Operations; Howard Marcus, VP of Sales and Marketing; Michael Perfetto, Chief Commercial Officer Generic RX/OTC, US and Canada; Doug Statler, Sr. Director/Head of Sales;

115.    Executives, senior management, and salespeople from Defendants Actavis, Perrigo, Sandoz, and Taro also attended the 2014 Total Store Expo on August 23-26 at the Boston Convention Center in Massachusetts.  A similar set of representatives from Defendants Actavis, Perrigo, Sandoz, and Taro (and its parent, Sun) attended the 2015 Total Store Expo on August 22-25 at the Colorado Convention Center in Denver.  And again the following year, high-ranking officers and key sales personnel from Perrigo, Sandoz, and Taro (and its parent, Sun) attended the 2016 Total Store Expo on August 19-22 at the San Diego Convention Center in San Diego, California.

116.    Defendants' high-ranking corporate officers attended other NACDS events as well. For example, Andrew Boyer, President and CEO of North America Generics for Actavis and Christopher Kapral, Sr. VP of Consumer Healthcare Sales for Perrigo both attended the NACDS's annual foundation dinner in New York City on December 3, 2013.

**FILED WITH REDACTIONS – PUBLIC VERSION**

117.  ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████

118.     In addition to providing an opportunity to share information about the generic pharmaceutical business, these trade association events often include recreational and social activities such as golfing, theater performances, cocktail parties, and dinners, which allowed Defendants' representatives to interact with their competitors privately and outside the traditional business setting.

119.     As uncovered in the state attorneys' general investigation, representatives of generic drug manufacturers get together separately, in more limited groups, allowing them to further meet face-to-face with their competitors and discuss their business.  In fact, high-level executives of many generic drug manufacturers get together periodically for what at least some of them refer to as "industry dinners."[47]

120.     A large number of generic drug manufacturers, including all Defendants here, are headquartered in close proximity to one another in New York, New Jersey or eastern Pennsylvania, giving them easier and more frequent opportunities to meet and collude.  For example, in January

---

[47] *See, e.g.*, *State of Connecticut et al. v. Aurobindo et al.* (D. Conn.), at ¶¶ 50-60, *available at* http://www.ct.gov/ag/lib/ag/press_releases/2016/20161215_gdms_complain.pdf .

FILED WITH REDACTIONS – PUBLIC VERSION

2014, at a time when the prices of a number of generic drugs were reportedly soaring, including Defendants' Desonide products' prices, at least thirteen high-ranking male executives, including CEOs, Presidents, and Senior Vice Presidents of various generic drug manufacturers, met at a steakhouse in Bridgewater, New Jersey.

121.    Generic pharmaceutical sales women also get together regularly for what they refer to as a "Girls' Night Out" ("GNO"), or alternatively "Women in the Industry" meetings and dinners.  During these GNOs, meetings and dinners, these representatives meet with their competitors and discuss competitively sensitive information.  Several different GNOs were held in 2015, including: (1) in Baltimore, Maryland in May, and (2) at the NACDS conference in August.

122.    Through these various interactions, Defendants' sales and marketing executives are often acutely aware of their competition and, more importantly, each other's current and future business plans.  This familiarity gives them the opportunity to communicate about bids and pricing strategy, and share information regarding the terms of their contracts with customers, including various terms relating to pricing, price protection, and rebates.

123.    Defendants' common membership in trade associations such as the GPhA and the NACDS, among others, and the participation of industry executives in trade association events and related activities, gave Defendants ample opportunities to exchange information concerning the pricing of their Desonide products and to reach and implement agreements to increase the prices of those products.

**G.    Defendants' concerted efforts to increase prices for generic Desonide yielded supracompetitive profits**

124.    Defendants' collusive price increases provided them with artificially inflated profits—profits that were funded in part by independent pharmacy purchasers of Desonide.

FILED WITH REDACTIONS – PUBLIC VERSION

125.   **Actavis**: According to IMS data, after entering the Desonide cream market in September 2013, Actavis had ███████████████████████████████████████ ██████████████████████████ .

126.   **Perrigo**: According to IMS data, Perrigo's sales of Desonide increased from around ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ████████████████ .

127.   Perrigo's parent company reported in its November 2013 10-Q that in the three months ended September 28, 2013 (which included its Desonide price increases) its net pharmaceutical sales were $41 million higher than for the same period in 2012.  Perrigo attributed the increase to "improved pricing on select products as compared to the prior year," among other things.

128.   **Sandoz**: According to IMS data, ██████████████████████████████████ ████████████████████████████████████████████ .

129.   **Taro**:  According to IMS data, Taro's sales of Desonide (ointment and cream) increased from around ████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ████████████████████████████████ .

130.   Taro's parent company's 20-F filing for the year ended March 2014 (which included the June 2013 price increases), reported that gross profits increased by $85 million as compared to the prior year.  The increase was "primarily the result of price adjustments on select products."  SEC filings by Taro's parent company have consistently listed Desonide among its "key products."

131.   Defendants' agreement to inflate the prices of generic drugs led to increased revenue and higher profits – which provided powerful motives for the conspiracy.

**H.     The Desonide market is susceptible to collusion**

132.   Publicly available data on the Desonide markets in the United States demonstrate that they are susceptible to cartelization by Defendants. Factors that make a market susceptible to collusion include:   (1)   a   high   degree   of   industry   concentration; (2) significant barriers to entry; (3) inelastic demand; (4) the lack of available substitutes for the goods involved; (5) a standardized product with a high degree of interchangeability between the products of cartel participants; and (6) inter-competitor contacts and communication.

**1.     Industry concentration**

133.   A high degree of concentration facilitates the operation of a cartel because it makes it easier to coordinate behavior among co-conspirators.

134.   Desonide is available in five different formulations.  Only two of the formulations (cream and ointment) experienced dramatic price increases in June 2013 and are at issue in this case.  The markets for those formulations were controlled almost exclusively by Defendants at the time of the price increases, creating conditions favorable to an effective cartel:

**FILED WITH REDACTIONS – PUBLIC VERSION**



135.    When Actavis and Sandoz entered the Desonide cream and ointment markets, the Defendants similarly controlled both of those markets.

136.    While the markets for Desonide are sufficiently concentrated to facilitate collusion, the years of low and stable pricing in the markets establish that the number of manufacturers in the markets was sufficient to drive competition. Absent collusion, prices would have remained at competitive levels.

137.    No departures from the markets by manufacturers of Desonide can explain the price increases.

138.    Defendants have been able to maintain supracompetitive prices for Desonide without significant loss of market share to non-conspirators.  Thus, Defendants have oligopolistic market power in the markets for Desonide.

139.    The magnitude of Defendants' price increases for Desonide distinguishes them from non-collusive oligopolistic pricing.  Non-collusive oligopolistic pricing would be expected to proceed incrementally, as manufacturers test the waters to see if competitors will follow a price

FILED WITH REDACTIONS – PUBLIC VERSION

increase.  But here the increases are extreme, and such extreme pricing moves are not rational in the absence of advance knowledge that competitors will join the increase.

## 2. Barriers to entry

140.    Supracompetitive pricing in a market normally attracts additional competitors who want to avail themselves of the high levels of profitability that are available. However, the presence of significant barriers to entry makes this more difficult and helps to facilitate the operation of a cartel.

141.    There are significant capital, regulatory, and intellectual property barriers to entry in the Desonide markets that make such entry time-consuming and expensive.  Among other things, prospective generic manufacturers must establish manufacturing processes sufficient to safely produce large amounts of bioequivalent product.  The manufacturing facilities must follow the FDA's rigorous Current Good Manufacturing Practice regulations.  These challenges can be particularly pronounced for dermatological products like Desonide.  As Kal Sundaram, former CEO of Taro's parent company has explained, the FDA's testing requirements for dermatological products "makes [their] development more expensive and also it takes more time."[48]

142.    In addition to the significant out-of-pocket costs required to bring a drug to market, the approval process for generic drugs takes significant time. As Kansas Senator Jerry Moran commented on September 21, 2016 during Congressional hearings on the FDA's role in the generic drug market, "there are more than 4,000 generic drug applications currently awaiting approval, and the median time it takes for the FDA to approve a generic is now 47 months or nearly four

---

[48] Taro, Q2 2015 Earnings Call Transcript (Nov. 4, 2015), *available at* https://seekingalpha.com/article/3645596-taro-pharmaceutical-industries-taro-ceo-kal-sundaram-q2-2015-results-earnings-call-transcript?page=8.

FILED WITH REDACTIONS – PUBLIC VERSION

years."[49] This significant delay for new market entrants effectively precludes new competition from eroding the supracompetitive prices imposed by the conspiracy.

### 3.     Demand inelasticity

143.     A product exhibits completely inelastic demand if buyers will continue to buy it regardless of the price. No product is completely inelastic, but prescription medicines come close.

144.     Demand for Defendants' Desonide products is inelastic largely because, while they are somewhat interchangeable with one another, they cannot be substituted for other products given their pharmacological characteristics.  Additionally, some actors in the Desonide market are not sensitive to price, as they are in most other markets.  Doctors who prescribe Desonide have the best therapy and not the cheapest cost in mind; patients cannot write themselves a prescription for a cheaper substitute or comfortably forgo treatment; and pharmacies have no choice but to fill the prescription as written.  When Defendants increased their Desonide prices, independent pharmacies could not simply purchase and dispense less-expensive alternative products.

145.     In order for a cartel to profit from raising prices above competitive levels, demand must be sufficiently inelastic such that any loss in sales will be more than offset by increases in revenue on those sales that are made.  Otherwise, increased prices would result in declining sales, as customers purchased substitute products or declined to buy altogether. Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue.

146.     The Desonide formulations at issue in this case also do not exhibit cross-elasticities of demand with respect to the formulations not at issue in this case (*i.e.,* gel and lotion).  As a

---

[49] Senator Moran, Statement (Sep. 21, 2016), *available at* http://www.appropriations.senate.gov/imo/media/doc/092116-Chairman-Moran-Opening-Statement.pdf.

FILED WITH REDACTIONS – PUBLIC VERSION

result, these other Desonide formulations did not experience sustained increased sales volumes as a result of Defendants price increases of the formulations at issue in this case:



147.    Thus, Desonide is an excellent candidate for cartelization because price increases will result in more revenue, rather than less, provided that most or all manufacturers participate.

### 4.    Lack of substitutes

148.    Desonide is a Class VI, mild potency topical corticosteroid used to treat a wide variety of skin conditions, including eczema, psoriasis, and dermatitis.

149.    There are typically no substitute drugs that afford patients the same therapeutic benefits as Desonide.  As a Class VI corticosteroid, Desonide is much milder than other, more potent topical corticosteroids.  It is therefore often used as the first step in treatment before stronger medications are prescribed.  There are at most three other corticosteroids in Class VI, and those products have different active ingredients—and thus different therapeutic properties, benefits, and drawbacks—than Desonide.

FILED WITH REDACTIONS – PUBLIC VERSION

150.    Desonide is often the only effective medicine when indicated.  Patients prescribed Desonide by their doctor consider Desonide a medical necessity that must be purchased without regard to an increase in price.

151.    Desonide is also differentiated from other drug products because of its regulatory status.  A generic drug is considered a therapeutic equivalent of—and AB-rated with respect to—the Reference Listed Drug (RLD) (often the brand name version of a drug).  Defendants' Desonide products are not therapeutically equivalent to—or AB-rated with respect to—other drug products, even similar ones.  Thus, a patient prescribed Desonide could not purchase a different drug using his or her Desonide prescription, regardless of the respective prices of the drugs.  Desonide cream is not, for example, therapeutically equivalent to triamcinolone .025% cream, even though both are mild topical corticosteroid creams.  As a result, a patient for whom Desonide cream is prescribed could not purchase triamcinolone .025% with the Desonide prescription, regardless of the respective prices of the drugs.

152.    Each formulation of Desonide has unique dermatological properties and uses, and the formulations are thus not substitutes for one another.  The ointment formulation is, for example, generally considered the strongest delivery mechanism, and is prescribed accordingly.  Lotion is often prescribed for ear problems because it does not impair hearing as would cream or ointment formulations.  Many other characteristics likewise differentiate the indications and uses for the various Desonide formulations.

153.    In addition, the branded version of Desonide does not serve as economic substitute for generic versions of Desonide.  Branded products generally maintain substantial price premiums over their generic counterparts, making them inapt substitutes even when generic prices soar.  With

49

respect to Desonide, prior to and at the time of the price increases, there are no reported sales for Desowen.

154.    Thus, purchasers of Desonide are held captive to the supracompetitive prices that resulted from Defendants' conspiracy to fix prices and allocate markets and customers.

### 5.    Standardized product with high degree of interchangeability

155.    A commodity-like product is one that is standardized across suppliers and allows for a high degree of substitutability among different suppliers in the market. When products offered by different suppliers are viewed as interchangeable by purchasers, it is easier for the suppliers to agree on prices for the goods in question and to monitor those prices effectively.

156.    Generic drugs of the same chemical composition are effectively commodity products because the primary mechanism through which they compete is price. When approving an ANDA, the FDA confirms that a generic drug product is bioequivalent to the branded version of the drug.  This allows pharmacists to substitute that generic for the branded counterpart, as well as for any other generic that also is bioequivalent to the branded product.

157.    For each formulation of Desonide, Defendants' Desonide products are bioequivalent generics of their branded counterparts, enabling pharmacists to substitute them (any of them) for branded products.  Defendants' Desonide cream products are thus each interchangeable, as are Defendants' Desonide ointment products.

158.    Moreover, because Desonide products are interchangeable, there is little utility in attempting to distinguish the products based on quality, branding or service.  Accordingly, manufacturers generally spend little effort advertising or detailing (the practice of providing promotional materials and free samples to physicians) their generic compounds.  The primary means for one generic manufacturer to differentiate its product from another's is through price

competition.[50] The need to compete on price can drive producers of commodity products to conspire—as they did here—to fix prices.

### 6. Inter-competitor contacts and communications

159. As discussed above, Defendants' representatives met at conferences convened by customers and trade associations of customers (⬛⬛⬛⬛⬛⬛ and NACDS), private industry dinners, and similar events. Moreover, Defendants are members of and/or participants of the GPhA; thus, their representatives have many opportunities to meet and conspire at industry meetings. As noted in press reports, "prosecutors are taking a close look at trade associations as part of their investigation as having been one potential avenue for facilitating the collusion between salespeople at different generic producers."[51]

160. The State AG Complaint alleges that Defendants routinely coordinated their schemes through direct interaction with their competitors at industry trade shows, customer conferences, and other events. For example, Defendants Glazer and Malek admitted at their guilty plea hearings to engaging in discussions and attending meetings with competitors, during which they reached agreements to allocate customers, rig bids and fix prices of doxycycline hyclate and glyburide.

161. DOJ's and the Connecticut AG's investigations, and the grand jury subpoenas and investigative demands that have issued in conjunction with them, focus on inter-competitor communications. These types of communications are not unique or isolated, but are rampant; "[g]eneric drug manufacturers operate, through their respective senior leadership and marketing

---

[50] *See, e.g.,* GAO Report at 23 ("If another manufacturer offers a lower price to a customer, manufacturers we interviewed indicated that they are usually asked to match it or risk losing market share to the other manufacturer.").

[51] PaRR Report.

and sales executives, in a manner that fosters and promotes routine and direct interaction among their competitors."[52] The sheer number of companies implicated in the investigations highlights the prevalence in the generic drug industry of the types of contacts and communications that facilitate collusion:

    a.   **Aurobindo**: Aurobindo has disclosed receipt of a subpoena relating to the DOJ's generic drug investigation.[53] The company stated that it "received a subpoena in Mar[ch] 2016 requesting non-product specific information."[54]

    b.   **Citron**:  In December 2016, Aceto Corporation (which purchased Citron's generic drugs assets) disclosed that DOJ "executed a search warrant against the Company and also served a subpoena requesting documents and other information concerning potential antitrust violations in the sale of Glyburide, Glyburide/Metformin, and Fosinopril HCTZ products." The Connecticut AG requested that Citron produce all documents produced to DOJ.[55]

    c.   **Dr. Reddy's**:  In November 2016, Dr. Reddy's disclosed that it received subpoenas from DOJ and the Connecticut AG "seeking information relating to the marketing, pricing and sale of certain . . . generic products and any communications with competitors about such products."[56]

    d.   **Heritage**:  As a private company, Heritage is not required to make public disclosures.  Nonetheless, in the wake of the criminal guilty pleas by two of its executives, Heritage confirmed that it is "fully cooperating" with DOJ[57] and press reports indicate that Heritage has

---

[52] State AG Amended Complaint ¶ 7.

[53] Zeba Siddiqui, "India's Aurobindo shares hit nine-month low on US price-fixing lawsuit," Reuters (Dec 16, 2016), *available at* http://www.reuters.com/article/us-aurobindo-pharm-stocks-idUSKBN1450DV.

[54] Aurobindo Pharma, Ltd., BSE Disclosure (Dec. 16, 2016), *available at* http://www.bseindia.com/xml-data/corpfiling/AttachHis/3C8E03C7_A46F_4792_AED5_197E6961A77E_125855.pdf.

[55] Aceto Corp., SEC Form 8-K, Ex. 99.5, *available at* https://www.sec.gov/Archives/edgar/data/2034/000157104916020771/t1600804_ex99-5.htm.

[56] Dr. Reddy's, SEC Form 6-K (Nov. 10, 2016), *available at* http://www.drreddys.com/investors/reports-and-filings/sec-filings/?year=FY17.

[57] Tom Schoenberg , David McLaughlin & Sophia Pearson, "U.S. Generic Drug Probe Seen Expanding After Guilty Pleas," Bloomberg (Dec. 14, 2016), *available at*

**FILED WITH REDACTIONS – PUBLIC VERSION**

applied to DOJ's leniency program seeking amnesty for a cartel violation.[58]

e.  **Impax**:  In July 2014, Impax disclosed that it received a subpoena from the Connecticut AG concerning sales of generic digoxin.[59]  In November 2014, Impax disclosed that an employee received a broader federal grand jury subpoena that requested testimony and documents about "any communication or correspondence with any competitor (or an employee of any competitor) in the sale of generic prescription medications."[60] In February 2016, Impax disclosed that it received a DOJ subpoena requesting "information and documents regarding the sales, marketing, and pricing of certain generic prescription medications. In particular… digoxin tablets, terbutaline sulfate tablets, prilocaine/lidocaine cream, and calcipotriene topical solution."[61]

f.  **Lannett**: In July 2014, Lannett disclosed that it received a subpoena from the Connecticut AG relating to its investigation into the price-fixing of digoxin.[62] On November 3, 2014, Lannett disclosed that a Senior Vice President of Sales and Marketing was served with a grand jury subpoena "relating to a federal investigation of the generic pharmaceutical industry into possible violations of the Sherman Act." The subpoena also requested "corporate documents of the Company relating to communications or correspondence with competitors regarding the sale of generic prescription medications, but is not specifically directed to any particular product and is not limited to any particular time period."[63]  On August 27, 2015, Lannett further explained that DOJ sought, among other things, "communications or correspondence with competitors regarding the sale of generic prescription medications, and the marketing, sale, or

---

https://www.bloomberg.com/news/articles/2016-12-14/u-s-files-first-charges-in-generic-drug-price-fixing-probe.

[58] *See supra* ¶20.

[59] Impax SEC Form 8-K (July 15, 2014), *available at*
https://www.sec.gov/Archives/edgar/data/1003642/000143774914012809/ipxl20140715_8k.htm.

[60] Impax SEC Form 8-K (Nov. 6, 2014), *available at*
https://www.sec.gov/Archives/edgar/data/1003642/000119312514402210/d816555d8k.htm.

[61] Impax, SEC 2015 Form 10-K (Feb. 22, 2016), at F-53, *available at*
https://www.sec.gov/Archives/edgar/data/1003642/000143774916025780/ipxl20151231_10k.htm.

[62] Lannett press release (July 16, 2014), *available at* http://lannett.investorroom.com/2014-07-16-Lannett-Receives-Inquiry-From-Connecticut-Attorney-General.

[63] Lannett, SEC Form 10-Q (Nov. 6, 2014) at 16, *available at*
https://www.sec.gov/Archives/edgar/data/57725/000110465914077456/a14-20842_110q.htm.

FILED WITH REDACTIONS – PUBLIC VERSION

pricing of certain products, generally for the period of 2005 through the dates of the subpoenas."[64]

g.  **Mayne**:  On August 25, 2016, Mayne Pharma Group Limited (the parent of Mayne) disclosed that it was "one of numerous generic pharmaceutical companies to receive a subpoena…seeking information relating to marketing, pricing and sales of select generic drugs" and that it had received a subpoena from the Connecticut AG seeking similar information.[65]  On November 4, 2016, Mayne Pharma Group Limited issued a press release stating: "Previously on 28 Jun[e] 2016, Mayne Pharma Group Limited disclosed that it was one of several generic companies to receive a subpoena from the Antitrust Division of the US Department of Justice (DOJ) seeking information relating to the marketing, pricing and sales of select generic products. The investigation relating to Mayne Pharma is focused on doxycycline hyclate delayed-release tablets (generic) and potassium chloride powders."[66]

h.  **Mylan**:  In February 2016, Mylan disclosed that it received a DOJ subpoena "seeking information relating to…generic Doxycycline" and a similar subpoena from the Connecticut AG seeking "information relating to…certain of the Company's generic products (including Doxycycline) and communications with competitors about such products."[67] On Nov. 9, 2016, Mylan disclosed that "certain employees and a member of senior management, received subpoenas from the DOJ seeking additional information relating to the marketing, pricing and sale of our generic Cidofovir, Glipizide-metformin, Propranolol and Verapamil products" and that "[r]elated search warrants also were executed" in connection with DOJ's investigation.[68]

---

[64] Lannett, SEC Form 10-K (Aug. 27, 2015) at 18, *available at* http://www.sec.gov/Archives/edgar/data/57725/000110465915062047/a15-13005_110k.htm.

[65] Mayne Pharma, 2016 Annual Report (Aug. 25, 2016), at 75, *available at* https://www.maynepharma.com/media/1788/2016-mayne-pharma-annual-report.pdf.

[66] Mayne Pharma, Update on DOJ Investigation (Nov. 4, 2016), *available at* http://asxcomnewspdfs.fairfaxmedia.com.au/2016/11/04/01798874-137879061.pdf.

[67] Mylan, SEC 2015 Form 10-K (Feb. 16, 2016), at 160, *available at* https://www.sec.gov/Archives/edgar/data/1623613/000162361316000046/myl10k_20151231xdoc.htm.

[68] Mylan SEC Form 10-Q, at 58 (Nov. 9, 2016), *available at* https://www.sec.gov/Archives/edgar/data/1623613/000162361316000071/myl10q_20160930xdoc.htm.

**FILED WITH REDACTIONS – PUBLIC VERSION**

i.     **Par**: In March 2015, Par disclosed that it received subpoenas from the Connecticut AG and DOJ relating to digoxin and doxycycline.[69] In November 2015, Endo International plc, the parent company of Par, elaborated: "In December 2014, our subsidiary, Par, received a Subpoena to Testify Before Grand Jury from the Antitrust Division of the DOJ and issued by the U.S. District Court for the Eastern District of Pennsylvania. The subpoena requests documents and information focused primarily on product and pricing information relating to Par's authorized generic version of Lanoxin (digoxin) oral tablets and Par's generic doxycycline products, and on communications with competitors and others regarding those products. Par is currently cooperating fully with the investigation."[70] Endo also disclosed that in December 2015 it "received Interrogatories and Subpoena Duces Tecum from the State of Connecticut Office of Attorney General requesting information regarding pricing of certain of its generic products, including Doxycycline Hyclate, Amitriptyline Hydrochloride, Doxazosin Mesylate, Methotrexate Sodium and Oxybutynin Chloride."[71]

j.     **Sun**: On May 27, 2016, Sun Pharmaceutical Industries, Ltd. (the parent of Sun) stated in a filing with the National Stock Exchange of India that one of its U.S subsidiaries, namely Sun, "received a grand jury subpoena from the United States Department of Justice, Antitrust Division seeking documents…relating to corporate and employee records, generic pharmaceutical products and pricing, communications with competitors and others regarding the sale of generic pharmaceutical products, and certain other related matters."[72]

k.     **Teva**: In August 2016, Teva disclosed that it received subpoenas from DOJ and the Connecticut AG seeking documents and other information "relating to the marketing and pricing of certain of Teva

---

[69] Par Pharmaceuticals Companies, Inc., SEC 2014 Form 10-K (Mar. 12, 2015) at 37, *available at* https://www.sec.gov/Archives/edgar/data/878088/000087808815000002/prx-20141231x10k.htm.

[70] Endo International plc, SEC Form 10-Q (March 31, 2016) at 30, *available at* https://www.sec.gov/Archives/edgar/data/1593034/000159303416000056/endp-3312016x10q.htm.

[71] *Id.* at 31.

[72] Sun Pharmaceuticals Indus., Ltd., BSE Disclosure (May 27, 2016), *available at* http://www.bseindia.com/xml-data/corpfiling/AttachHis/8E568708_8D00_472E_B052_666C76A4263D_081648.pdf.

**FILED WITH REDACTIONS – PUBLIC VERSION**

USA's generic products and communications with competitors about such products."[73]

l.     **Zydus**: Press reports have stated the Zydus is a target of DOJ's generic drugs price-fixing investigation.[74]

## IX.     THE STATUTES OF LIMITATIONS DO NOT BAR PLAINTIFFS' CLAIMS

### A.     The statutes of limitations did not begin to run because Plaintiffs did not and could not discover Defendants' unlawful conspiracy

162.     Plaintiffs had no knowledge of the combination or conspiracy alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth herein, until (at the earliest) Defendants' disclosures of the existence of the government investigations and subpoenas. Prior to that time, no information in the public domain or available to Plaintiffs suggested that any Defendant was involved in a criminal conspiracy to fix prices for Desonide.  And indeed, Defendants' disclosures regarding the government investigations did not indicate Desonide specifically.

163.     No information evidencing antitrust violations was available in the public domain prior to the public announcements of the government investigations that revealed sufficient information to suggest that any of the defendants was involved in a criminal conspiracy to fix prices for Desonide.

164.     Plaintiffs had no direct contact or interaction with any of the Defendants in this case and had no means by which they could have discovered Defendants' conspiracy.

---

[73] Teva, SEC Form 6-K at 25 (Aug. 4, 2016), *available at*
https://www.sec.gov/Archives/edgar/data/818686/000119312516671785/d187194d6k.htm.
[74] *See* Rupali Mukherjeel, "US polls, pricing pressure may hit Indian pharma cos," The Times of India (Nov. 8, 2016), *available at* http://timesofindia.indiatimes.com/business/india-business/US-polls-pricing-pressure-may-hit-Indian- pharma-cos/articleshow/55301060.cms.

**FILED WITH REDACTIONS – PUBLIC VERSION**

165.    Defendants repeatedly and expressly stated throughout the Class Period, including on their public Internet websites, that they maintained antitrust/fair competition policies which prohibited the type of collusion alleged in this Complaint. For example:

a.    Allergan's (predecessor to Actavis) Code of Conduct states: "We support a free and open market, which is why we comply with competition laws everywhere we do business and strive to always compete fairly."[75]

b.    Perrigo's Code of Conduct provides: "We will succeed based on the quality and value of our products and not by illegal or otherwise improper business practices. Competition laws, also known as "antitrust" laws, generally prohibit agreements with competitors, suppliers or customers that could unfairly limit free and open competition."[76]

c.    Novartis's (the parent of Sandoz) Code of Conduct provides: "We are committed to fair competition and will not breach competition laws and regulations."[77]

d.    Taro's Code of Conduct provides: "we do not discuss any of the following topics with our competitors: prices or price-fixing, customer or market allocation, bids or bid-rigging, any topic that seems to be about restricting competition.  If a competitor attempts to engage you in a discussion on any of these topics, make it clear that you do not wish to participate. Leave the conversation immediately, and report the matter to Corporate Compliance."[78]

e.    Taro's parent company, Sun Pharmaceutical Industries, Ltd.'s Global Code of Conduct provides: "We seek to outperform our competition fairly and honestly. We seek competitive advantages through superior performance, never through unethical or illegal business practices." It goes on to state: "Sun Pharma shall compete only in an ethical and legitimate manner and prohibits all actions

---

[75] Allergan Code of Conduct, *available at* http://www.allergan.com/investors/corporate-governance/code-of-conduct.

[76] Perrigo Code of Conduct, *available at* http://perrigo.investorroom.com/download/Code+of+Conduct.pdf.

[77] Novartis Code of Conduct, *available at* https://www.novartis.com/sites/www.novartis.com/files/code-of-conduct-english.pdf.

[78] Taro Code of Conduct, *available at* http://www.taro.com/media/oMedia/TaroCOC.pdf.

FILED WITH REDACTIONS – PUBLIC VERSION

that are anti-competitive or otherwise contrary to applicable competition or anti-trust laws."[79]

166. It was reasonable for members of the Class to believe that Defendants were complying with their own antitrust policies.

167. For these reasons, the statutes of limitations as to Plaintiffs' claims under the federal and state common laws identified herein did not begin to run, and have been tolled with respect to the claims that Plaintiffs have alleged in this Complaint.

**B.      Fraudulent concealment tolled the statutes of limitations**

168. In the alternative, application of the doctrine of fraudulent concealment tolled the statutes of limitations on the claims asserted by Plaintiffs.  Plaintiffs had no knowledge of the combination or conspiracy alleged in this Complaint, or of facts sufficient to place them on inquiry notice of their claims, until Defendants disclosed the existence of government investigations and subpoenas. Prior to that time, no information in the public domain or available to Plaintiffs suggested that any Defendant was involved in a criminal conspiracy to fix prices for Desonide.

169. No information evidencing antitrust violations was available in the public domain prior to the public announcements of the government investigations that revealed sufficient information to suggest that any of the defendants was involved in a criminal conspiracy to fix prices for Desonide.

170. Defendants actively concealed, suppressed, and omitted to disclose material facts to Plaintiffs and members of the Classes concerning Defendants' unlawful activities to artificially inflate prices for Desonide. The concealed, suppressed, and omitted facts would have been important to Plaintiffs and members of the Classes as they related to the cost of Desonide they

---

[79] Sun Pharma Global Code of Conduct, available at http://www.sunpharma.com/Shareholder-Information/Policies/93092/Global-Code-of-Conduct.

**FILED WITH REDACTIONS – PUBLIC VERSION**

purchased. Defendants misrepresented the real cause of price increases and/or the absence of price reductions in Desonide. Defendants' false statements and conduct concerning the prices of Desonide were deceptive as they had the tendency or capacity to mislead Plaintiffs and members of the Classes to believe that they were purchasing Desonide at prices established by a free and fair market.

### 1.    Active concealment of the conspiracy

171.    Defendants engaged in an illegal scheme to fix prices, allocate customers and rig bids. Criminal and civil penalties for engaging in such conduct are severe.  Not surprisingly, Defendants took affirmative measures to conceal their conspiratorial conduct.

172.    Through their misleading, deceptive, false and fraudulent statements, Defendants effectively concealed their conspiracy, thereby causing economic harm to Plaintiffs and the Classes. Defendants' misrepresentations regarding their price changes were intended to lull Plaintiffs and the Classes into accepting the price hikes as a normal result of competitive and economic market trends rather than as the consequence of Defendants' collusive acts. The public statements made by Defendants were designed to mislead Plaintiffs and the Classes into paying unjustifiably higher prices for Desonide.

173.    As explained in the State AG complaint, the nature of the generic drug industry— which allows for frequent and repeated face-to-face meetings among competitors—means that "Most of the conspiratorial communications were intentionally done in person or by cell phone, in an attempt to avoid creating a record of their illegal conduct. The generic drug industry, through the aforementioned opportunities to collude at trade shows, customer events and smaller more intimate dinners and meetings, allowed these communications to perpetuate."[80]

---

[80] State AG Amended Complaint ¶ 13.

FILED WITH REDACTIONS – PUBLIC VERSION

174.   These types of false statements and others made by Defendants helped conceal the illegal conspiracy entered into by Defendants to fix, stabilize, maintain and raise the price of Desonide to inflated, supracompetitive levels.

### 2.   Plaintiffs exercised reasonable diligence

175.   Defendants' anticompetitive conspiracy, by its very nature, was self-concealing. Generic drugs are not exempt from antitrust regulation, and thus, before the disclosure of the government investigations, Plaintiffs reasonably considered the markets to be competitive. Accordingly, a reasonable person under the circumstances would not have been alerted to investigate the legitimacy of Defendants' prices before these disclosures.

176.   Because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to conceal their illicit conduct, Plaintiffs and the Classes could not have discovered the conspiracy at an earlier date by the exercise of reasonable diligence.

177.   Therefore, the running of any statutes of limitations has been tolled for all claims alleged by Plaintiffs and the Classes as a result of Defendants' anticompetitive and unlawful conduct.  Despite the exercise of reasonable diligence, Plaintiffs and Members of the Classes were unaware of Defendants' unlawful conduct, and did not know that they were paying supracompetitive prices throughout the United States during the Class Period.

178.   For these reasons, Plaintiffs' claims are timely under all of the federal, state and common laws identified herein.

## X.   <u>CONTINUING VIOLATIONS</u>

179.   This Complaint alleges a continuing course of conduct (including conduct within the limitations periods), and defendants' unlawful conduct has inflicted continuing and accumulating harm within the applicable statutes of limitations. Thus, Plaintiffs and the members

**FILED WITH REDACTIONS – PUBLIC VERSION**

of the Damages Class can recover for damages that they suffered during any applicable limitations period.

## XI.   DEFENDANTS' ANTITRUST VIOLATIONS

180.    During the Class Period, set forth below, Defendants engaged in a continuing agreement, understanding, and conspiracy in restraint of trade to allocate customers, rig bids, and fix raise and/or stabilize prices for Desonide sold in the United States.

181.    In formulating and effectuating the contract, combination or conspiracy, Defendants identified above and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were to allocate customers, rig bids and artificially fix, raise, maintain, and/or stabilize the price of Desonide sold in the United States. These activities included the following:

   a.    Defendants participated in meetings and/or conversations regarding the price of Desonide in the United States;

   b.    Defendants agreed during those meetings and conversations to charge prices at specified levels and otherwise to increase and/or maintain prices of Desonide sold in the United States;

   c.    Defendants agreed during those meetings and conversations to allocate customers, rig bids, and fix the price of Desonide; and

   d.    Defendants issued price announcements and price quotations in accordance with their agreements.

184.    Defendants and their co-conspirators engaged in the activities described above for the purpose of effectuating the unlawful agreements described in this Complaint.

185.    During and throughout the period of the conspiracy alleged in this Complaint, Plaintiffs and members of the Classes indirectly purchased Desonide at inflated and supracompetitive prices.

186.    Defendants' contract, combination and conspiracy constitutes an unreasonable restraint of trade and commerce in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3) and the laws of various IRP Damages Jurisdictions enumerated below.

187.    As a result of Defendants' unlawful conduct, Plaintiffs and the other members of the Classes have been injured in their business and property in that they have paid more for Desonide than they would have paid in a competitive market.

188.    General economic principles recognize that any overcharge at a higher level of distribution generally results in higher prices at every level below. Moreover, the institutional structure of pricing and regulation in the pharmaceutical drug industry assures that overcharges at the higher level of distribution are passed on to independent pharmacies such as Plaintiffs. Wholesalers and retailers passed on the inflated prices to Plaintiffs and members of the Class. The impairment of generic competition at the direct purchaser level similarly injured Plaintiffs who were equally denied the opportunity to purchase less expensive generic versions of Desonide.

189.    The unlawful contract, combination and conspiracy has had the following effects, among others:

        a.    price competition in the markets for Desonide has been artificially restrained;

        b.    prices for Desonide sold by Defendants have been raised, fixed, maintained, or stabilized at artificially high and non-competitive levels; and

        c.    independent pharmacy purchasers of Desonide sold by Defendants have been deprived of the benefit of free and open competition in the markets for Desonide.

## XII.    CLASS ACTION ALLEGATIONS

190.    Plaintiffs bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief on behalf of the following class (the "Nationwide Class"):

FILED WITH REDACTIONS – PUBLIC VERSION

All privately held pharmacies in the United States and its territories that purchased Defendants' generic Desonide products (including cream and ointment) from May 1, 2013 through the present.

This class excludes: (a) defendants, their officers, directors, management, employees, subsidiaries and affiliates; (b) any pharmacies owned in part by judges or justices involved in this action or any members of their immediate families; (c) all pharmacies owned or operated by publicly traded companies.

191. Plaintiffs also bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages pursuant to the common law of unjust enrichment and the state antitrust, unfair competition, and consumer protection laws of the states and territories listed below (the "IRP Damages Jurisdictions")[81] on behalf of the following class (the "Damages Class"):

All privately held pharmacies in the IRP Damages Jurisdictions that indirectly purchased Defendants' generic Desonide products (including cream and ointment) from May 1, 2013 through the present.[82]

This class excludes: (a) defendants, their officers, directors, management, employees, subsidiaries and affiliates; (b) all persons or entities who purchased Desonide products directly from defendants; (c) any pharmacies owned in part by judges or justices involved in this action or any members of their immediate families; (d) all pharmacies owned or operated by publicly traded companies.

192. The Nationwide Class and the Damages Class are referred to herein as the "Classes."

---

[81] The IRP Damages Jurisdictions, for purposes of this complaint, are: Alabama, Alaska, Arizona, Arkansas, California, Colorado, Delaware, Florida, Georgia, Idaho, Illinois, Iowa, Kansas, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin and Wyoming as well as the District of Columbia, Puerto Rico and the U.S. Virgin Islands.

[82] Plaintiffs may seek to certify state classes rather than a single Damages Class. See ¶ [198].

FILED WITH REDACTIONS – PUBLIC VERSION

193.    While Plaintiffs do not know the exact number of the members of the Classes, rosters of members of national independent pharmacy organizations indicate that there are at least 20,000 members in each class.

194.    Common questions of law and fact exist as to all members of the Classes. This is particularly true given the nature of Defendants' conspiracy, which was generally applicable to all the members of both Classes, thereby making appropriate relief with respect to the Classes as a whole. Such questions of law and fact common to the Classes include, but are not limited to:

a.    Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain and/or stabilize prices of generic Desonide and/or engaged in market allocation for generic Desonide sold in the United States;

b.    The identity of the participants of the alleged conspiracy;

c.    The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

d.    Whether the alleged conspiracy violated the Sherman Act, as alleged in the First Count;

e.    Whether the alleged conspiracy violated state antitrust and unfair competition laws, and/or state consumer protection laws, as alleged in the Second and Third Counts;

f.    Whether Defendants unjustly enriched themselves to the detriment of the Plaintiffs and the members of the Classes, thereby entitling Plaintiffs and the members of the Classes to disgorgement of all benefits derived by Defendants, as alleged in the Fourth Count;

g.    Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiffs and the members of the Classes;

h.    The effect of the alleged conspiracy on the prices of generic Desonide sold in the United States during the Class Period;

i.    Whether the Defendants and their co-conspirators actively concealed, suppressed, and omitted to disclose material facts to Plaintiffs and members of the Classes concerning Defendants' unlawful activities to artificially inflate prices for generic generic Desonide, and/or fraudulently concealed

the unlawful conspiracy's existence from Plaintiffs and the other members of the Classes;

j.    The appropriate injunctive and related equitable relief for the Nationwide Class; and

k.    The appropriate class-wide measure of damages for the Damages Class.

195.    Plaintiffs' claims are typical of the claims of the members of the Classes.   Plaintiffs and all members of the Classes are similarly affected by Defendants' wrongful conduct in that they paid artificially inflated prices for generic Desonide purchased indirectly from Defendants and/or their co-conspirators. Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes.

196.    Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Classes. Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

197.    The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

198.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in

FILED WITH REDACTIONS – PUBLIC VERSION

management of this class action. Plaintiffs reserve the discretion to certify the Damages Class as separate classes for each of the IRP Damages Jurisdictions or as separate classes for certain groups of IRP Damages Jurisdictions, should the Court's subsequent decisions in this case render that approach more efficient. Whether certified together or separately, the total number and identity of the members of the Damages Class would remain consistent.

199.    The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## XIII.    CAUSES OF ACTION

### FIRST COUNT

### Violation of Sections 1 and 3 of the Sherman Act
### (on behalf of Plaintiffs and the Nationwide Class)

200.    Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

201.    Defendants and their unnamed co-conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. § 1, 3).

202.    During the Class Period, Defendants and their co-conspirators entered into a continuing agreement, understanding and conspiracy in restraint of trade to artificially allocate customers, rig bids and raise, maintain and fix prices for generic Desonide, thereby creating anticompetitive effects.

203.    The conspiratorial acts and combinations have caused unreasonable restraints in the market for generic Desonide.

FILED WITH REDACTIONS – PUBLIC VERSION

204.    As a result of Defendants' unlawful conduct, Plaintiffs and other similarly situated independent pharmacies in the Nationwide Class who purchased generic Desonide have been harmed by being forced to pay inflated, supracompetitive prices for generic Desonide.

205.    In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including, but not limited to, the acts, practices and course of conduct set forth herein.

206.    Defendants' conspiracy had the following effects, among others:

a.    Price competition in the market for generic Desonide has been restrained, suppressed, and/or eliminated in the United States;

b.    Prices for generic Desonide provided by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States; and

c.    Plaintiffs and members of the Nationwide Class who purchased generic Desonide indirectly from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

207.    Plaintiffs and members of the Nationwide Class have been injured and will continue to be injured in their business and property by paying more for generic Desonide purchased indirectly from Defendants and the co-conspirators than they would have paid and will pay in the absence of the conspiracy.

208.    Defendants' contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

209.    Plaintiffs and members of the Nationwide Class are entitled to an injunction against Defendants, preventing and restraining the continuing violations alleged herein.

FILED WITH REDACTIONS – PUBLIC VERSION

## SECOND COUNT

### Violation of State Antitrust Statutes[83]
### (on behalf of Plaintiffs and the Damages Class)

210.    Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

211.    During the Class Period, Defendants and their co-conspirators engaged in a continuing contract, combination or conspiracy with respect to the sale of generic Desonide in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

212.    The contract, combination, or conspiracy consisted of an agreement among Defendants and their co-conspirators to fix, raise, inflate, stabilize, and/or maintain the prices of generic Desonide and to allocate customers for generic Desonide in the United States.

213.    In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including:

    a.    participating in meetings and conversations among themselves in the United States and elsewhere during which they agreed to price generic Desonide at certain levels, and otherwise to fix, increase, inflate, maintain, or stabilize effective prices paid by Plaintiffs and members of the Damages Class with respect to generic Desonide provided in the United States; and

    b.    participating in meetings and trade association conversations among themselves in the United States and elsewhere to implement, adhere to, and police the unlawful agreements they reached.

214.    Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreement to allocate customers, rig bids, and fix prices for

---

[83] Statutory antitrust violations are alleged herein for the following jurisdictions: Alabama, Arizona, California, District of Columbia, Illinois, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia and Wisconsin.

FILED WITH REDACTIONS – PUBLIC VERSION

generic Desonide. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

215.    In addition, defendants have profited significantly from the conspiracy. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of plaintiffs and the members of the Damages Class.

216.    Accordingly, plaintiffs and the members of the Damages Class in each of the following jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the following state laws.

217.    Defendants' anticompetitive acts described above were knowing, willful and constitute violations or flagrant violations of the following state antitrust statutes:

218.    **Alabama:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Alabama Code § 6-5-60, et seq. Defendants' combinations and conspiracy had the following effects: (1) price competition for generic Desonide was restrained, suppressed, and eliminated throughout Alabama; (2) generic Desonide prices were raised, fixed, maintained and stabilized at artificially high levels throughout Alabama. During the Class Period, Defendants' illegal conduct substantially affected Alabama commerce. By reason of the foregoing, Defendants entered into an agreement in restraint of trade in violation of Alabama Code § 6-5-60, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Alabama Code § 6-5-60, et seq.

219.    **Arizona:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Arizona Revised Statutes, § 44-1401, et seq. Defendants' combination and

conspiracy had the following effects: (1) price competition for generic Desonide was restrained, suppressed, and eliminated throughout Arizona; (2) generic Desonide prices were raised, fixed, maintained and stabilized at artificially high levels throughout Arizona. During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce. Defendants' violations of Arizona law were flagrant.  As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants entered into an agreement in restraint of trade in violation of Ariz. Rev. Stat. § 44-1401, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Ariz. Rev. Stat. § 44-1401, et seq.

220.    **California:** Defendants have entered into an unlawful agreement in restraint of trade in violation of California Business and Professions Code § 16700 et seq. During the Class Period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of California Business and Professions Code §16720. Defendants, and each of them, have acted in violation of § 16720 to fix, raise, stabilize, and maintain prices of generic Desonide at supracompetitive levels. The aforesaid violations of § 16720 consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain, and stabilize the prices of generic Desonide. For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators have done those things which they combined and conspired to do, including, but not limited to, the acts, practices and course of conduct set forth above and creating a price floor, fixing, raising, and stabilizing the price of generic Desonide. The combination and conspiracy alleged herein has had, inter alia, the following

70

effects: (1) price competition for generic Desonide has been restrained, suppressed, and/or eliminated in the State of California; (2) prices for generic Desonide provided by Defendants and their co-conspirators have been fixed, raised, stabilized, and pegged at artificially high, non-competitive levels in the State of California; and (3) those who purchased generic Desonide indirectly from Defendants and their co-conspirators have been deprived of the benefit of free and open competition. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property in that they paid more for generic Desonide than they otherwise would have paid in the absence of Defendants' unlawful conduct. During the Class Period, Defendants' illegal conduct substantially affected California commerce. As a result of Defendants' violation of § 16720, Plaintiffs and members of the Damages Class seek treble damages and their cost of suit, including a reasonable attorney's fee, pursuant to California Business and Professions Code § 16750(a).

221. **District of Columbia:** Defendants have entered into an unlawful agreement in restraint of trade in violation of District of Columbia Code Annotated § 28-4501, et seq. Defendants' combination and conspiracy had the following effects: (1) generic Desonide price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) generic Desonide prices were raised, fixed, maintained and stabilized at artificially high levels throughout the District of Columbia; (3) Plaintiffs and members of the Damages Class, including those who resided in the District of Columbia and/or purchased generic Desonide in the District of Columbia that were shipped by Defendants or their co-conspirators into the District of Columbia, were deprived of free and open competition, including in the District of Columbia; and (4) Plaintiffs and members of the Damages Class, including those who resided in the District of Columbia and/or purchased generic Desonide in the District of Columbia that were shipped by

Defendants or their co-conspirators, paid supracompetitive, artificially inflated prices for generic Desonide, including in the District of Columbia. During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of District of Columbia Code Ann. § 28-4501, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under District of Columbia Code Ann. § 28-4501, et seq.

222.    **Illinois:** Defendants have entered into an unlawful agreement in restraint of trade in violation of the Illinois Antitrust Act (740 Illinois Compiled Statutes 10/1, et seq.) Defendants' combination or conspiracy had the following effects: (1) generic Desonide price competition was restrained, suppressed, and eliminated throughout Illinois; (2) generic Desonide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Illinois. During the Class Period, Defendants' illegal conduct substantially affected Illinois commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under the Illinois Antitrust Act.

223.    **Iowa:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Iowa Code § 553.1, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Desonide price competition was restrained, suppressed, and eliminated throughout Iowa; (2) generic Desonide prices were raised, fixed, maintained and stabilized at artificially high levels throughout Iowa. During the Class Period, Defendants' illegal conduct

72

substantially affected Iowa commerce. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Iowa Code § 553.1, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Iowa Code § 553, et seq.

224.    **Kansas:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Kansas Statutes Annotated, § 50-101, et seq. Defendants' combined capital, skills or acts for the purposes of creating restrictions in trade or commerce of generic Desonide, increasing the prices of generic Desonide, preventing competition in the sale of generic Desonide, or binding themselves not to sell generic Desonide, in a manner that established the price of generic Desonide and precluded free and unrestricted competition among themselves in the sale of generic Desonide, in violation of Kan. Stat. Ann. § 50-101, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Desonide price competition was restrained, suppressed, and eliminated throughout Kansas; (2) generic Desonide prices were raised, fixed, maintained and stabilized at artificially high levels throughout Kansas. During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Kansas Stat. Ann. § 50-101, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all forms of relief available under Kansas Stat. Ann. § 50-101, et seq.

225.    **Maine:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Maine Revised Statutes (Maine Rev. Stat. Ann. 10, § 1101, et seq.) Defendants' combination or conspiracy had the following effects: (1) generic Desonide price competition was restrained, suppressed, and eliminated throughout Maine; (2) generic Desonide prices were raised, fixed, maintained and stabilized at artificially high levels throughout Maine. During the Class

Period, Defendants' illegal conduct substantially affected Maine commerce. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Maine Rev. Stat. Ann. 10, § 1101, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Maine Rev. Stat. Ann. 10, § 1101, et seq.

226.   **Michigan:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Michigan Compiled Laws Annotated § 445.771, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Desonide price competition was restrained, suppressed, and eliminated throughout Michigan; (2) generic Desonide prices were raised, fixed, maintained and stabilized at artificially high levels throughout Michigan. During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Michigan Comp. Laws Ann. § 445.771, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Michigan Comp. Laws Ann. § 445.771, et seq.

227.   **Minnesota:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Minnesota Annotated Statutes § 325D.49, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Desonide price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) generic Desonide prices were raised, fixed, maintained and stabilized at artificially high levels throughout Minnesota. During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the

**FILED WITH REDACTIONS – PUBLIC VERSION**

foregoing, Defendants have entered into an agreement in restraint of trade in violation of Minnesota Stat. § 325D.49, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Minnesota Stat. § 325D.49, et seq.

228.   **Mississippi:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Mississippi Code Annotated § 75-21-1, et seq. Trusts are combinations, contracts, understandings or agreements, express or implied when inimical to the public welfare and with the effect of, inter alia, restraining trade, increasing the price or output of a commodity, or hindering competition in the production and sale of a commodity. Miss. Code Ann. § 75-21-1. Defendants' combination or conspiracy was in a manner inimical to public welfare and had the following effects: (1) generic Desonide price competition was restrained, suppressed, and eliminated throughout Mississippi; (2) generic Desonide prices were raised, fixed, maintained and stabilized at artificially high levels throughout Mississippi. During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Mississippi Code Ann. § 75-21-1, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Mississippi Code Ann. § 75-21-1, et seq.

229.   **Nebraska:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Nebraska Revised Statutes § 59-801, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Desonide price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) generic Desonide prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nebraska. During the Class Period, Defendants'

illegal conduct substantially affected Nebraska commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Nebraska Revised Statutes § 59-801, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nebraska Revised Statutes § 59-801, et seq.

230.    **Nevada:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Nevada Revised Statutes Annotated § 598A.010, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Desonide price competition was restrained, suppressed, and eliminated throughout Nevada; (2) generic Desonide prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nevada. During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Nevada Rev. Stat. Ann. § 598A.010, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Nevada Rev. Stat. Ann. § 598A.010, et seq.

231.    **New Hampshire:** Defendants have entered into an unlawful agreement in restraint of trade in violation of New Hampshire Revised Statutes § 356:1, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Desonide price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) generic Desonide prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Hampshire. During the Class Period, Defendants' illegal conduct substantially affected New Hampshire commerce. As a

**FILED WITH REDACTIONS – PUBLIC VERSION**

direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of New Hampshire Revised Statutes § 356:1, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Hampshire Revised Statutes § 356:1, et seq.

232. **New Mexico:** Defendants have entered into an unlawful agreement in restraint of trade in violation of New Mexico Statutes Annotated § 57-1-1, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Desonide price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) generic Desonide prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Mexico. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of New Mexico Stat. Ann. § 57-1-1, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New Mexico Stat. Ann. § 57-1-1, et seq.

233. **New York:** Defendants have entered into an unlawful agreement in restraint of trade in violation of New York General Business Law § 340, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Desonide price competition was restrained, suppressed, and eliminated throughout New York; (2) generic Desonide prices were raised, fixed, maintained and stabilized at artificially high levels throughout New York that were higher than they would have been absent Defendants' illegal acts. During the Class Period, Defendants' illegal

FILED WITH REDACTIONS – PUBLIC VERSION

conduct substantially affected New York commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of New York General Business Law § 340, et seq. The conduct set forth above is a per se violation of the Act. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under New York Gen. Bus. Law § 340, et seq.

234.   **North Carolina:** Defendants have entered into an unlawful agreement in restraint of trade in violation of the North Carolina General Statutes § 75-1, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Desonide price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) generic Desonide prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Carolina. During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of North Carolina Gen. Stat. § 75-1, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Carolina Gen. Stat. § 75-1, et. seq.

235.   **North Dakota:** Defendants have entered into an unlawful agreement in restraint of trade in violation of North Dakota Century Code § 51-08.1-01, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Desonide price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) generic Desonide prices were raised, fixed, maintained and stabilized at artificially high levels throughout North Dakota. During the

Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of North Dakota Cent. Code § 51-08.1-01, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under North Dakota Cent. Code § 51-08.1-01, et seq.

236.    **Oregon:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Oregon Revised Statutes § 646.705, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Desonide price competition was restrained, suppressed, and eliminated throughout Oregon; (2) generic Desonide prices were raised, fixed, maintained and stabilized at artificially high levels throughout Oregon. During the Class Period, Defendants' illegal conduct had a substantial effect on Oregon commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Oregon Revised Statutes § 646.705, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Oregon Revised Statutes § 646.705, et seq.

237.    **Rhode Island:** Defendants have entered into an unlawful agreement in restraint of trade in violation of the Rhode Island Antitrust Act, Rhode Island General Laws § 6-36-1, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Desonide price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) generic Desonide prices were raised, fixed, maintained and stabilized at artificially high levels throughout

**FILED WITH REDACTIONS – PUBLIC VERSION**

Rhode Island. During the Class Period, Defendants' illegal conduct had a substantial effect on Rhode Island commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property on or after July 15, 2013, and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Rhode Island General Laws § 6-36-1, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Rhode Island General Laws § 6-36-1, et seq.

238.   **South Dakota:** Defendants have entered into an unlawful agreement in restraint of trade in violation of South Dakota Codified Laws § 37-1-3.1, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Desonide price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) generic Desonide prices were raised, fixed, maintained and stabilized at artificially high levels throughout South Dakota. During the Class Period, Defendants' illegal conduct had a substantial effect on South Dakota commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of South Dakota Codified Laws Ann. § 37-1-3.1, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under South Dakota Codified Laws Ann. § 37-1-3.1, et seq.

239.   **Tennessee:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Tennessee Code Annotated § 47-25-101, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Desonide price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) generic Desonide prices were raised, fixed,

FILED WITH REDACTIONS – PUBLIC VERSION

maintained and stabilized at artificially high levels throughout Tennessee. During the Class Period, Defendants' illegal conduct had a substantial effect on Tennessee commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Tennessee Code Ann. § 47-25-101, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Tennessee Code Ann. § 47-25-101, et seq.

240.   **Utah:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Utah Code Annotated § 76-10-3101, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Desonide price competition was restrained, suppressed, and eliminated throughout Utah; (2) generic Desonide prices were raised, fixed, maintained and stabilized at artificially high levels throughout Utah. During the Class Period, Defendants' illegal conduct had a substantial effect on Utah commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Utah Code Annotated § 76-10-3101, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Utah Code Annotated § 76-10-3101, et seq.

241.   **Vermont:** Defendants have entered into an unlawful agreement in restraint of trade in violation of Vermont Stat. Ann. 9 § 2453, et seq. Defendants' combination or conspiracy had the following effects: (1) generic Desonide price competition was restrained, suppressed, and eliminated throughout Vermont; (2) generic Desonide prices were raised, fixed, maintained and stabilized at artificially high levels throughout Vermont. During the Class Period, Defendants'

81

illegal conduct had a substantial effect on Vermont commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Vermont Stat. Ann. 9 § 2453, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Vermont Stat. Ann. 9 § 2453, et seq.

242.    **West Virginia:** Defendants have entered into an unlawful agreement in restraint of trade in violation of West Virginia Code § 47-18-1, et seq. Defendants' anticompetitive acts described above were knowing, willful, and constitute violations or flagrant violations of West Virginia Antitrust Act. Defendants' combination or conspiracy had the following effects: (1) generic Desonide price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) generic Desonide prices were raised, fixed, maintained and stabilized at artificially high levels throughout West Virginia. During the Class Period, Defendants' illegal conduct had a substantial effect on West Virginia commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of West Virginia Code § 47-18-1, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under West Virginia Code § 47-18-1, et seq.

243.    **Wisconsin:** Defendants have entered into an unlawful agreement in restraint of trade in violation of the Wisconsin Statutes § 133.01, et seq. Defendants' and their co-conspirators' anticompetitive activities have directly, foreseeably and proximately caused injury to Plaintiffs and members of the Classes in the United States. Specifically, Defendants' combination or

conspiracy had the following effects: (1) generic Desonide price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) generic Desonide prices were raised, fixed, maintained and stabilized at artificially high levels throughout Wisconsin.   During the Class Period, Defendants' illegal conduct had a substantial effect on the people of Wisconsin and Wisconsin commerce. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. By reason of the foregoing, Defendants have entered into an agreement in restraint of trade in violation of Wisconsin Stat. § 133.01, et seq. Accordingly, Plaintiffs and members of the Damages Class seek all relief available under Wisconsin Stat. § 133.01, et seq.

244.    **As to All Jurisdictions Above:** Plaintiffs and members of the Damages Class in each of the above jurisdictions have been injured in their business and property by reason of Defendants' unlawful combination, contract, conspiracy and agreement. Plaintiffs and members of the Damages Class have paid more for generic Desonide than they otherwise would have paid in the absence of Defendants' unlawful conduct. This injury is of the type the antitrust laws of the above states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

245.    In addition, Defendants have profited significantly from the aforesaid conspiracy. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of Plaintiffs and members of the Damages Class.

246.    Accordingly, Plaintiffs and members of the Damages Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or

otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

### THIRD COUNT

**Violation of State Consumer Protection Statutes[84]**
**(on behalf of Plaintiffs and the Damages Class)**

247.     Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

248.     Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

249.     **Alaska:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Alaska Statute § 45.50.471, *et seq.* Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which generic Desonide were sold, distributed, or obtained in Alaska and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. The aforementioned conduct on the part of Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Alaska law. Defendants' unlawful conduct had the following effects: (1) generic Desonide price competition was restrained, suppressed, and eliminated throughout Alaska; (2) generic Desonide prices were raised, fixed, maintained, and stabilized at artificially high levels

---

[84] Statutory consumer protection / deceptive trade violations are alleged herein for the following jurisdictions: Alaska, Arkansas, California, Colorado, Delaware, Florida, Georgia, Michigan, Minnesota, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, South Carolina, South Dakota, West Virginia, Wisconsin and the U.S. Virgin Islands.

FILED WITH REDACTIONS – PUBLIC VERSION

throughout Alaska. During the Class Period, Defendants' illegal conduct substantially affected Alaska commerce and consumers. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Alaska Stat. § 45.50.471, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

250.    **Arkansas:** Defendants have knowingly entered into an unlawful agreement in restraint of trade in violation of the Arkansas Code Annotated, § 4-88-101, *et seq*. Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which generic Desonide were sold, distributed, or obtained in Arkansas and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class.  Defendant Taro increased the price of Desonide, a medical supply, by 10% or more during the 30 days following a declaration of a state of emergency in Arkansas, in violation of A.C.A. § 4-88-303 *et seq.*[85] The aforementioned conduct on the part of Defendants constituted "unconscionable" and "deceptive" acts or practices in violation of Arkansas Code Annotated, § 4-88-107(a)(10). Defendants' unlawful conduct had the following effects: (1) generic Desonide price competition was restrained, suppressed, and eliminated throughout Arkansas; (2) generic Desonide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arkansas. During the Class Period, Defendants' illegal conduct substantially affected Arkansas commerce and consumers. As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in

---

[85] States of emergency for Arkansas were declared on at least January 3, 2013; January 17, 2014; March 3, 2014; April 28, 2014; and February 18, 2015; and September 8, 2015.

FILED WITH REDACTIONS – PUBLIC VERSION

violation of Arkansas Code Annotated, § 4-88-107(a)(10) and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

251.   **California:** Defendants have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of California Business and Professions Code § 17200, *et seq.* During the Class Period, Defendants manufactured, marketed, sold, or distributed generic Desonide in California, and committed and continue to commit acts of unfair competition, as defined by § 17200, *et seq.* of the California Business and Professions Code, by engaging in the acts and practices specified above. This claim is instituted pursuant to §§ 17203 and 17204 of the California Business and Professions Code, to obtain restitution from these Defendants for acts, as alleged herein, that violated § 17200 of the California Business and Professions Code, commonly known as the Unfair Competition Law. Defendants' conduct as alleged herein violated § 17200. The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of California Business and Professions Code §17200, *et seq.*, including, but not limited to, the following: (1) the violations of Section 1 of the Sherman Act, as set forth above; (2) the violations of § 16720, *et seq.* of the California Business and Professions Code, set forth above. Defendants' acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of § 16720, *et seq.* of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent; (3) Defendants' acts or practices are unfair to purchasers of generic Desonide in the State of California within the meaning of § 17200, California Business and Professions Code; and (4) Defendants' acts and practices are fraudulent or deceptive

86

**FILED WITH REDACTIONS – PUBLIC VERSION**

within the meaning of Section 17200 of the California Business and Professions Code. Moreover, Defendant Perrigo unlawfully raised the price of Desonide, a medical supply, by more than 10% during the 30 days following a declaration of a state of emergency in California, in violation of the California Penal Code § 396, thereby committing "unlawful" and "unfair" prohibited business practices under § 17200.[86] Plaintiffs and members of the Damages Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that have been obtained by Defendants as a result of such business acts or practices. During the Class Period, Defendants' illegal conduct substantially affected California commerce and consumers. The illegal conduct alleged herein is continuing and there is no indication that Defendants will not continue such activity into the future. The unlawful and unfair business practices of Defendants, and each of them, as described above, have caused and continue to cause Plaintiffs and members of the Damages Class to pay supracompetitive and artificially-inflated prices for generic Desonide. Plaintiffs and members of the Damages Class suffered injury in fact and lost money or property as a result of such unfair competition. The conduct of Defendants as alleged in this Complaint violates § 17200 of the California Business and Professions Code. As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. Plaintiffs and members of the Damages Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings,

---

[86] States of Emergency for California were declared on at least August 22, 2012; July 12, 2013; August 9, 2013; August 22, 2013; August 23, 2013; September 20, 2013; September 30, 2013; October 31, 2013; January 17, 2014; April 29, 2014; May 14, 2014; August 2, 2014; August 24, 2014; September 17, 2014; December 22, 2014; May 19, 2015; May 20, 2015; July 22, 2015; July 31, 2015; September 11, 2015; September 13, 2015; December 18, 2015  February 1, 2016; February 19, 2016; April 19, 2016; June 7, 2016; June 24, 2016; July 26, 2016; July 9, 2016; August 16, 2016.

**FILED WITH REDACTIONS – PUBLIC VERSION**

profits, compensation, and benefits that may have been obtained by Defendants as a result of such business practices, pursuant to the California Business and Professions Code, §§17203 and 17204.

252.  **Colorado:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Colorado Consumer Protection Act, Colorado Rev. Stat. § 6-1-101, *et seq*.  Defendants engaged in an unfair and deceptive trade practices during the course of their business dealings, which significantly impacted Plaintiffs as actual or potential consumers of the Defendants' goods and which caused Plaintiffs to suffer injury. Defendants took efforts to conceal their agreements from Plaintiffs. Defendants' unlawful conduct had the following effects: (1) generic Desonide price competition was restrained, suppressed, and eliminated throughout Colorado; (2) generic Desonide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Colorado. During the Class Period, Defendants' illegal conduct substantially affected Colorado commerce and consumers. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Colorado Rev. Stat. § 6-1-101, *et seq*., and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute and as equity demands.

253.  **Delaware:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Delaware Consumer Fraud Act, 6 Del. Code § 2511, *et seq.*  Defendants agreed to, and did in fact, act in restraint of trade or commerce in Delaware, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Desonide were sold, distributed, or obtained in Delaware. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Desonide. Defendants misrepresented to all purchasers during the Class Period that

88

Defendants' generic Desonide prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Desonide price competition was restrained, suppressed, and eliminated throughout Delaware; (2) generic Desonide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Delaware. During the Class Period, Defendants' illegal conduct had a substantial effect on Delaware commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Desonide, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Desonide at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of 6 Del. Code § 2511, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

254. **Florida:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq*. Defendants' unlawful conduct had the following effects: (1) generic Desonide price competition was restrained, suppressed, and eliminated throughout Florida; (2) generic Desonide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Florida. During the Class Period, Defendants' illegal conduct substantially affected Florida commerce and consumers. Defendants have engaged in unfair competition or unfair or

**FILED WITH REDACTIONS – PUBLIC VERSION**

deceptive acts or practices in violation of Florida Stat. § 501.201, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

255.   **Georgia:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Georgia Uniform Deceptive Trade Practices Act, Georgia Code § 10-1-370, *et seq.*   Defendants agreed to, and did in fact, act in restraint of trade or commerce in Georgia, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Desonide were sold, distributed, or obtained in Georgia. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Desonide. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Desonide prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Desonide price competition was restrained, suppressed, and eliminated throughout Georgia; (2) generic Desonide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Georgia. During the Class Period, Defendants' illegal conduct had a substantial effect on Georgia commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above and are threatened with further injury. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Desonide, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Desonide at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of

**FILED WITH REDACTIONS – PUBLIC VERSION**

Georgia Code § 10-1-370, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute and as equity demands.

256.    **Michigan:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Michigan Consumer Protection Statute, Mich. Compiled Laws § 445.903, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce in Michigan, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Desonide were sold, distributed, or obtained in Michigan. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Desonide. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Desonide prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Desonide price competition was restrained, suppressed, and eliminated throughout Michigan; (2) generic Desonide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Michigan. During the Class Period, Defendants' illegal conduct had a substantial effect on Michigan commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Desonide, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Desonide at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of

FILED WITH REDACTIONS – PUBLIC VERSION

Mich. Compiled Laws § 445.903, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

257.   **Minnesota:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.43, *et seq*.  Defendants engaged in an unfair and deceptive trade practices during the course of their business dealings, which significantly impacted Plaintiffs as actual or potential consumers of the Defendants' goods and which caused Plaintiffs to suffer injury. Defendants took efforts to conceal their agreements from Plaintiffs. Defendants' unlawful conduct had the following effects: (1) generic Desonide price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) generic Desonide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Minnesota. During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce and consumers. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Minn. Stat. § 325D.43, *et seq*., and, accordingly, Plaintiffs and members of the Class seek all relief available under that statute and as equity demands.

258.   **Nebraska:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Nebraska Consumer Protection Act, Neb. Rev. Stat. § 59-1601, *et seq*.  Defendants' unlawful conduct had the following effects: (1) generic Desonide price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) generic Desonide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nebraska. During the Class Period, Defendants marketed, sold, or distributed generic Desonide in Nebraska, and Defendants' illegal conduct substantially affected Nebraska commerce and consumers. Defendants have engaged in unfair competition or unfair or

92

deceptive acts or practices in violation of Neb. Rev. Stat. § 59-1601, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

259.    **Nevada:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. § 598.0903, *et seq*.  Defendants agreed to, and did in fact, act in restraint of trade or commerce in Nevada, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Desonide were sold, distributed, or obtained in Nevada. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Desonide. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Desonide prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Desonide price competition was restrained, suppressed, and eliminated throughout Nevada; (2) generic Desonide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nevada. During the Class Period, Defendants' illegal conduct had a substantial effect on Nevada commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Desonide, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Desonide at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of Nev. Rev. Stat. § 598.0903, *et seq*.,

FILED WITH REDACTIONS – PUBLIC VERSION

and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

260. **New Hampshire:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Hampshire Consumer Protection Act, N.H. Rev. Stat. § 358-A:1, *et seq.* Defendants' unlawful conduct had the following effects: (1) generic Desonide price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) generic Desonide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Hampshire. During the Class Period, Defendants marketed, sold, or distributed generic Desonide in New Hampshire, and Defendants' illegal conduct substantially affected New Hampshire commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of N.H. Rev. Stat. § 358-A:1, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

261. **New Jersey:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Jersey Consumer Fraud Act, N.J. Statutes § 56:8-1, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce in New Jersey, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Desonide were sold, distributed, or obtained in New Jersey. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Desonide. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Desonide prices were competitive and fair. Defendants Sandoz and Actavis

94

FILED WITH REDACTIONS – PUBLIC VERSION

raised prices of Desonide, which is "used to preserve, protect, or sustain the life, health, safety or comfort of persons," by more than 10% within 30 days of the termination of a state of emergency in New Jersey, in violation of N.J. Statutes § 56:8-107 *et seq.*[87] Defendants' unlawful conduct had the following effects: (1) generic Desonide price competition was restrained, suppressed, and eliminated throughout New Jersey; (2) generic Desonide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Jersey. During the Class Period, Defendants' illegal conduct had a substantial effect on New Jersey commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Desonide, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Desonide at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of N.J. Statutes § 56:8-1, *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

262.   **New Mexico:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Mexico Stat. § 57-12-1, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing,

---

[87] States of emergency for New Jersey were declared on at least October 27, 2012; October 28, 2012; January 2, 2013; January 21, 2014; November 26, 2014; December 23, 2014; January 26, 2015; March 4, 2015; and January 22, 2016

FILED WITH REDACTIONS – PUBLIC VERSION

controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which generic Desonide were sold, distributed or obtained in New Mexico and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. The aforementioned conduct on the part of Defendants constituted "unconscionable trade practices," in violation of N.M.S.A. Stat. § 57-12-3, in that such conduct, *inter alia*, resulted in a gross disparity between the value received by Plaintiffs and members of the Damages Class and the prices paid by them for generic Desonide as set forth in N.M.S.A., § 57-12-2E. Plaintiffs and members of the Damages Class were not aware of Defendants' price-fixing conspiracy and were therefore unaware that they were being unfairly and illegally overcharged. Defendants had the sole power to set that price, and Plaintiffs and members of the Damages Class had no power to negotiate a lower price. Moreover, Plaintiffs and members of the Damages Class lacked any meaningful choice in purchasing generic Desonide because they were unaware of the unlawful overcharge, and there was no alternative source of supply through which Plaintiffs and members of the Damages Class could avoid the overcharges. Defendants' conduct with regard to sales of generic Desonide, including their illegal conspiracy to secretly fix the price of generic Desonide at supracompetitive levels and overcharge consumers, was substantively unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public. Defendants took grossly unfair advantage of Plaintiffs and members of the Damages Class. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices for consumers so that there was a gross disparity between the price paid and the value received for generic Desonide. Defendants' unlawful conduct had the following effects: (1) generic Desonide price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) generic Desonide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout

New Mexico. During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce and consumers. As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs and members of the Damages Class have been injured and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

263.   **New York:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq.* Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which generic Desonide were sold, distributed or obtained in New York and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. Defendants and their co-conspirators made public statements about the prices of generic Desonide that either omitted material information that rendered the statements that they made materially misleading or affirmatively misrepresented the real cause of price increases for generic Desonide; and Defendants alone possessed material information that was relevant to consumers, but failed to provide the information. Because of Defendants' unlawful trade practices in the State of New York, New York class members who indirectly purchased generic Desonide were misled to believe that they were paying a fair price for generic Desonide or the price increases for generic Desonide were for valid business reasons; and similarly situated consumers were affected by Defendants' conspiracy. Defendants knew that their unlawful trade practices with respect to pricing generic Desonide would have an impact on New York consumers and not just Defendants' direct customers. Defendants knew that their unlawful trade practices with respect to pricing generic

FILED WITH REDACTIONS – PUBLIC VERSION

Desonide would have a broad impact, causing consumer class members who indirectly purchased generic Desonide to be injured by paying more for generic Desonide than they would have paid in the absence of Defendants' unlawful trade acts and practices. The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of consumers in New York State in an honest marketplace in which economic activity is conducted in a competitive manner. Defendants' unlawful conduct had the following effects: (1) generic Desonide price competition was restrained, suppressed, and eliminated throughout New York; (2) generic Desonide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York. During the Class Period, Defendants marketed, sold, or distributed generic Desonide in New York, and Defendants' illegal conduct substantially affected New York commerce and consumers. During the Class Period, each of Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed generic Desonide in New York. Plaintiffs and members of the Damages Class seek all relief available pursuant to N.Y. Gen. Bus. Law § 349(h).

264. **North Carolina:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which generic Desonide were sold, distributed or obtained in North Carolina and took efforts to conceal their agreements from Plaintiffs and members of the Damages Class. Defendants' price-fixing conspiracy could not have succeeded absent deceptive conduct by Defendants to cover up their illegal acts. Secrecy was integral to the formation, implementation and maintenance of

Defendants' price-fixing conspiracy. Defendants committed inherently deceptive and self-concealing actions, of which Plaintiffs and members of the Damages Class could not possibly have been aware. Defendants and their co-conspirators publicly provided pretextual and false justifications regarding their price increases. Defendants' public statements concerning the price of generic Desonide created the illusion of competitive pricing controlled by market forces rather than supracompetitive pricing driven by Defendants' illegal conspiracy. Moreover, Defendants deceptively concealed their unlawful activities by mutually agreeing not to divulge the existence of the conspiracy to outsiders. Defendants charged "unreasonably excessive" prices for Desonide, which is a good "consumed or used to preserve, protect, or sustain life, health, safety, or economic well-being of persons or their property," in the 45 days following a declaration of a state of emergency by the Governor, in violation of North Carolina. Gen..Stat. § 75-38 and § 75-1.1.[88] The conduct of Defendants described herein constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner. Defendants' unlawful conduct had the following effects: (1) generic Desonide price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) generic Desonide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina. During the Class Period, Defendants marketed, sold, or distributed generic Desonide in North Carolina, and

---

[88] States of Emergency for North Carolina were declared on at least October 29, 2012; March 12, 2013; June 14, 2013; September 12, 2013; January 28, 2014; February 11, 2014; April 28, 2014; July 2, 2014; January 26, 2015; February 16, 2015; February 25, 2015; October 1, 2015; January 20, 2016; and February 17, 2016.

99

**FILED WITH REDACTIONS – PUBLIC VERSION**

Defendants' illegal conduct substantially affected North Carolina commerce and consumers. During the Class Period, each of Defendants named herein, directly, or indirectly and through affiliates they dominated and controlled, manufactured, sold and/or distributed generic Desonide in North Carolina. Plaintiffs and members of the Damages Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

265.    **North Dakota:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the North Dakota Unlawful Sales or Advertising Practices Statute, N.D. Century Code § 51-15-01, *et seq.*  Defendants agreed to, and did in fact, act in restraint of trade or commerce in North Dakota, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Desonide were sold, distributed, or obtained in North Dakota. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Desonide. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Desonide prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Desonide price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) generic Desonide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Dakota. During the Class Period, Defendants' illegal conduct had a substantial effect on North Dakota commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of

FILED WITH REDACTIONS – PUBLIC VERSION

money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Desonide, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Desonide at prices set by a free and fair market. Defendants' misleading conduct and unconscionable activities constitute violations of N.D. Century Code § 51-15-01, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

266. **Rhode Island:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Rhode Island Unfair Trade Practice and Consumer Protection Act, R.I. Gen. Laws § 6-13.1-1, *et seq*. Members of the Damages Class purchased generic Desonide for personal, family, or household purposes. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Rhode Island, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Desonide were sold, distributed, or obtained in Rhode Island. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Desonide. Defendants owed a duty to disclose such facts, and considering the relative lack of sophistication of the average, non-business purchaser, Defendants breached that duty by their silence. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Desonide prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Desonide price competition was restrained, suppressed, and eliminated throughout Rhode Island;

**FILED WITH REDACTIONS – PUBLIC VERSION**

(2) generic Desonide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Rhode Island. Defendants' illegal conduct substantially affected Rhode Island commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Desonide, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Desonide at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Desonide they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Rhode Island Gen. Laws. § 6-13.1-1, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

267.    **South Carolina:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of South Carolina Unfair Trade Practices Act, S.C. Code Ann. § 39-5-10, *et seq*. Defendants' combination or conspiracy had the following effects: (1) generic Desonide price competition was restrained, suppressed, and eliminated throughout South Carolina; (2) generic Desonide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Carolina. During the Class Period, Defendants' illegal conduct had a substantial effect on South Carolina commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the

FILED WITH REDACTIONS – PUBLIC VERSION

Damages Class have been injured in their business and property and are threatened with further injury. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.C. Code Ann. § 39-5-10, *et seq*., and, accordingly, Plaintiffs and the members of the Damages Class seek all relief available under that statute.

268.    **South Dakota:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the South Dakota Deceptive Trade Practices and Consumer Protection Statute, S.D. Codified Laws § 37-24-1, *et seq*.  Defendants agreed to, and did in fact, act in restraint of trade or commerce in South Dakota, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Desonide were sold, distributed, or obtained in South Dakota. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Desonide. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Desonide prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Desonide price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) generic Desonide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Dakota. Defendants' illegal conduct substantially affected South Dakota commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Desonide, likely misled all purchasers acting reasonably

FILED WITH REDACTIONS – PUBLIC VERSION

under the circumstances to believe that they were purchasing generic Desonide at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Desonide they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of S.D. Codified Laws § 37-24-1, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

269.    **Utah:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Utah Consumer Sales Practices Act, Ut. Stat. § 13-11-1, *et seq.*  Members of the Damages Class purchased generic Desonide for personal, family, or household purposes. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Utah, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Desonide were sold, distributed, or obtained in Utah. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Desonide. Defendants owed a duty to disclose such facts, and considering the relative lack of sophistication of the average, non-business purchaser, Defendants breached that duty by their silence. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Desonide prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Desonide price competition was restrained, suppressed, and eliminated throughout Utah; (2) generic Desonide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Utah. Defendants' illegal conduct substantially affected Utah commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or

property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above and are threatened with further injury. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Desonide, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Desonide at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Desonide they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ut. Stat. § 13-11-1 *et seq.*, and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute and as equity demands.

270. **Virginia:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Virginia Consumer Protection Act of 1977, Va. Code § 59.1-196, *et seq.* Members of the Damages Class purchased generic Desonide to be used for personal, family, or household purposes. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Virginia, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Desonide were sold, distributed, or obtained in Virginia. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Desonide. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Desonide prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Desonide price competition was restrained, suppressed, and eliminated throughout Virginia; (2) generic Desonide

prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Virginia. Defendants' illegal conduct substantially affected Virginia commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Desonide, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Desonide at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Desonide they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Va. Code § 59.1-196, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

271. **West Virginia:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the West Virginia Consumer Credit and Protection Act, W.Va. Code § 46A-6-101, *et seq.*  Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes West Virginia, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Desonide were sold, distributed, or obtained in West Virginia. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Desonide. Defendants affirmatively misrepresented to all purchasers during the Class Period that Defendants' generic Desonide prices

FILED WITH REDACTIONS – PUBLIC VERSION

were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Desonide price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) generic Desonide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout West Virginia. Defendants' illegal conduct substantially affected West Virginia commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Desonide, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Desonide at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Desonide they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of W.Va. Code § 46A-6-101, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

272. **Wisconsin:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Wisconsin Consumer Protection Statutes, Wisc. Stat. § 100.18, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Wisconsin, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Desonide were sold, distributed, or obtained in Wisconsin. Defendants affirmatively misrepresented to all purchasers during the Class Period that Defendants' generic Desonide prices were competitive and

FILED WITH REDACTIONS – PUBLIC VERSION

fair. Defendants' unlawful conduct had the following effects: (1) generic Desonide price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) generic Desonide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Wisconsin. Defendants' illegal conduct substantially affected Wisconsin commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations concerning the price of generic Desonide, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Desonide at prices set by a free and fair market. Defendants' affirmative misrepresentations constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Desonide they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wisc. Stat. § 100.18, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute.

273. **U.S. Virgin Islands:** Defendants have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the U.S. Virgin Islands Consumer Fraud and Deceptive Business Practices Act, 12A V.I.C. §§ 102, 301-35, *et seq*. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes U.S.V.I., by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which generic Desonide were sold, distributed, or obtained in U.S.V.I. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class

concerning Defendants' unlawful activities and artificially inflated prices for generic Desonide. Defendants affirmatively misrepresented to all purchasers during the Class Period that Defendants' generic Desonide prices were competitive and fair. Defendants' unlawful conduct had the following effects: (1) generic Desonide price competition was restrained, suppressed, and eliminated throughout U.S.V.I.; (2) generic Desonide prices were raised, fixed, maintained, and stabilized at artificially high levels throughout U.S.V.I.. Defendants' illegal conduct substantially affected U.S.V.I. commerce and consumers. As a direct and proximate result of Defendants' violations of law, Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above and are threatened with further injury. That loss was caused by Defendants' willful and deceptive conduct, as described herein. Defendants' deception, including their affirmative misrepresentations and omissions concerning the price of generic Desonide, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing generic Desonide at prices set by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and members of the Damages Class as they related to the cost of generic Desonide they purchased. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of 12A V.I.C. §§ 102, 301-35, *et seq*., and, accordingly, Plaintiffs and members of the Damages Class seek all relief available under that statute and as equity demands.

FILED WITH REDACTIONS – PUBLIC VERSION

## FOURTH COUNT

### Unjust Enrichment[89]
### (on behalf of Plaintiffs and the Damages Class)

274.    Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

275.    To the extent required, this claim is pleaded in the alternative to the other claims in this Complaint. This claim is brought under the equity precedents of each of the IRP Damages Jurisdictions.

276.    Defendants have unlawfully benefited from their sales of generic Desonide because of the unlawful and inequitable acts alleged in this Complaint. Defendants unlawfully overcharged privately held pharmacies, who purchased generic Desonide at prices that were more than they would have been but for Defendants' unlawful actions.

277.    Defendants' financial benefits resulting from their unlawful and inequitable acts are traceable to overpayments by Plaintiffs and members of the Damages Class.

278.    Plaintiffs and the Damages Class have conferred upon Defendants an economic benefit, in the nature of profits resulting from unlawful overcharges, to the economic detriment of Plaintiffs and the Damages Class.

279.    Defendants have been enriched by revenue resulting from unlawful overcharges for generic Desonide while Plaintiffs have been impoverished by the overcharges they paid for generic

---

[89] Unjust enrichment claims are alleged herein under the laws of Alabama, Alaska, Arizona, Arkansas, California, Colorado, Delaware, Florida, Georgia, Idaho, Illinois, Iowa, Kansas, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin and Wyoming as well as the District of Columbia, Puerto Rico and the U.S. Virgin Islands.

FILED WITH REDACTIONS – PUBLIC VERSION

Desonide imposed through Defendants' unlawful conduct.  Defendants' enrichment and Plaintiffs' impoverishment are connected.

280.    There is no justification for Defendants' retention of, and enrichment from, the benefits they received, which caused impoverishment to Plaintiffs and the Damages Class, because Plaintiffs and the Damages Class paid supracompetitive prices that inured to Defendants' benefit, and it would be inequitable for Defendants to retain any revenue gained from their unlawful overcharges.

281.    Plaintiffs did not interfere with Defendants' affairs in any manner that conferred these benefits upon Defendants.

282.    The benefits conferred upon Defendants were not gratuitous, in that they constituted revenue created by unlawful overcharges arising from Defendants' illegal and unfair actions to inflate the prices of generic Desonide.

283.    The benefits conferred upon Defendants are measurable, in that the revenue Defendants have earned due to their unlawful overcharges of generic Desonide are ascertainable by review of sales records.

284.    It would be futile for Plaintiffs and the Damages Class to seek a remedy from any party with whom they have privity of contract. Defendants have paid no consideration to any other person for any of the unlawful benefits they received indirectly from Plaintiffs and the Damages Class with respect to Defendants' sales of generic Desonide.

285.    It would be futile for Plaintiffs and the Damages Class to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which they indirectly purchased generic Desonide, as the intermediaries are not liable and cannot reasonably be expected to compensate Plaintiffs and the Damages Class for Defendants' unlawful conduct.

286.    The economic benefit of overcharges and monopoly profits derived by Defendants through charging supracompetitive and artificially inflated prices for generic Desonide is a direct and proximate result of Defendants' unlawful practices.

287.    The financial benefits derived by Defendants rightfully belong to Plaintiffs and the Damages Class, because Plaintiffs and the Damages Class paid supracompetitive prices during the Class Period, inuring to the benefit of Defendants.

288.    It would be inequitable under unjust enrichment principles under the law of the District of Columbia and the laws of all states and territories of the United States, except Ohio and Indiana, for Defendants to be permitted to retain any of the overcharges for generic Desonide derived from Defendants' unlawful, unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

289.    Defendants are aware of and appreciate the benefits bestowed upon them by Plaintiffs and the Damages Class.  Defendants consciously accepted the benefits and continue to do so as of the date of this filing, as generic Desonide prices remain inflated above pre-conspiracy levels.

290.    Defendants should be compelled to disgorge in a common fund for the benefit of Plaintiffs and the Damages Class all unlawful or inequitable proceeds they received from their sales of generic Desonide.

291.    A constructive trust should be imposed upon all unlawful or inequitable sums received by Defendants traceable to indirect purchases of generic Desonide by Plaintiffs and the Damages Class. Plaintiffs and the Damages Class have no adequate remedy at law.

## XIV.    <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs demand judgment for the following relief:

FILED WITH REDACTIONS – PUBLIC VERSION

A.      The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable Notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Class;

B.      That the unlawful conduct, contract, conspiracy, or combination alleged herein be adjudged and decreed: (a) an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act; (b) a per se violation of Section 1 of the Sherman Act; (c) an unlawful combination, trust, agreement, understanding and/or concert of action in violation of the state antitrust and unfair competition and consumer protection laws as set forth herein; and (d) acts of unjust enrichment by Defendants as set forth herein.

C.      Plaintiffs and members of the Damages Class recover damages, to the maximum extent allowed under such state laws, and that a judgment in favor of Plaintiffs and members of the Damages Class be entered against Defendants jointly and severally in an amount to be trebled to the extent such laws permit;

D.      Plaintiffs and members of the Damages Class recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully obtained;

E.      Plaintiffs and members of the Damages Class be awarded restitution, including disgorgement of profits Defendants obtained as a result of their acts of unfair competition and acts of unjust enrichment, and the Court establish of a constructive trust consisting of all ill-gotten gains from which Plaintiffs and members of the Damages Class may make claims on a pro rata basis;

**FILED WITH REDACTIONS – PUBLIC VERSION**

F.      Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

G.      Plaintiffs and members of the Classes be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate;

H.      Plaintiffs and members of the Classes recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

I.      Plaintiffs and members of the Classes have such other and further relief as the case may require and the Court may deem just and proper.

**FILED WITH REDACTIONS – PUBLIC VERSION**

## XV.   <u>JURY DEMAND</u>

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil

Procedure, of all issues so triable.

Dated: December 21, 2018                              Respectfully submitted,

<u>/s/  Jonathan W. Cuneo</u>

Peter Gil-Montllor                              Jonathan W. Cuneo
Christian Hudson                                Joel Davidow
**CUNEO, GILBERT & LADUCA LLP**                 Daniel Cohen
16 Court Street, Suite 1012                     Victoria Romanenko
Brooklyn, NY 11241                              Blaine Finley
202-789-3960                                    **CUNEO, GILBERT & LADUCA LLP**
pgil-montllor@cuneolaw.com                      4725 Wisconsin Ave., NW Suite 200
                                                Washington, DC 20016
                                                202-789-3960
                                                jonc@cuneolaw.com

                                                *Lead Counsel for the Indirect Reseller Plaintiffs*

**FILED WITH REDACTIONS – PUBLIC VERSION**